975 P.2d 950 (1999)
137 Wash.2d 651
Larry G. BACKLUND and Constance R. Backlund, individually an as parents of Ashley Amber-Lyn Backlund, and Ashley Amber-Lyn Backlund, through the guardian of her estate, James A. Degel, Petitioners,
v.
UNIVERSITY OF WASHINGTON, and State of Washington, Respondents.
No. 66096-4.
Supreme Court of Washington, En Banc.
Argued June 17, 1998.
Decided April 8, 1999.
*951 Daniel W. Ferm, Tacoma, Donovan Russell Flora, Seattle, for Petitioners.
Malcolm L. Edwards, Howard Goodfriend, Seattle, for Respondents.
TALMADGE, J.
We are asked to apply Washington's informed consent law for health care patients, RCW 7.70.050, in a case where the Backlunds allege Dr. Craig Jackson committed malpractice while he was employed by the University of Washington (University). They contend he was negligent in continuing to treat Ashley Backlund's jaundice at birth with phototherapy. They argue he should have abandoned phototherapy, a more conservative form of treatment for jaundice, or applied it in conjunction with a transfusion of Ashley's blood, a riskier procedure. A jury, however, exonerated Dr. Jackson and the University from any negligence in the decision to continue *952 phototherapy instead of transfusing the baby. Now, the Backlunds complain Dr. Jackson and the University failed to provide them sufficient information upon which to make an informed health care choice, thus violating RCW 7.70.050, subjecting Dr. Jackson and the University to liability despite their exoneration from liability for negligence.
The University argues a cause of action for failure to obtain informed consent is unavailable to the Backlunds as a matter of law where the jury exonerated Dr. Jackson and the University from negligence. We disagree with the University's contention.
But because the Backlunds did not prove the elements of a prima facie case of breach of informed consent, in particular "[t]hat a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts" as required by RCW 7.70.050(1)(c), we affirm the trial court's judgment dismissing the Backlunds' complaint.

ISSUES
1. Did the jury's exoneration of a physician from liability for negligence forestall a plaintiff's claim for failure to obtain informed consent under RCW 7.70.050?
2. Does a plaintiff establish a prima facie case under RCW 7.70.050 if the plaintiff fails to prove a reasonably prudent patient under similar circumstances would not have consented to a treatment if informed of material facts regarding such treatment?

FACTS
The Backlunds' daughter, Ashley, was born a week prematurely on December 31, 1987. She weighed six pounds, four ounces at birth. Ashley was transported to Children's Hospital Medical Center the next day when she began showing signs of respiratory distress. She was treated there by Dr. Craig Jackson, a neonatologist employed by the University of Washington.
Ashley suffered from hyperbilirubinemia, or jaundice, caused by elevated levels of bilirubin, a substance released into the bloodstream when red blood cells break down. Such jaundice is not uncommon among infants as approximately a third or more of all newborns at the intensive care unit at Children's Hospital have jaundice. Greatly elevated bilirubin levels, however, can result in permanent brain damage. When Ashley was admitted to Children's Hospital, her serum bilirubin level was 4.2 micrograms per deciliter. It gradually increased to as high as 22.0 mcg/dl on January 7, 1988, then decreased to 5.7 mcg/dl on January 18, 1988.
The type of jaundice Ashley experienced is generally treated with phototherapy, the exposure of the infant's skin to special lights. More serious cases are treated with a transfusion of all the blood in the infant's body, a treatment entailing greater risks including cardiac arrhythmia, bleeding, bacterial infection, and the development of air bubbles in the circulatory system. Dr. Jackson prescribed phototherapy for Ashley, but did not discuss transfusion with the Backlunds. The phototherapy proved unsuccessful, and Ashley suffered brain damage. The Backlunds allegedly were not informed of the risks associated with high bilirubin levels. They did not know Ashley's subsequent developmental problems were caused by the high bilirubin levels she suffered while at Children's Hospital until almost two years after her treatment there.
In 1992, the Backlunds commenced the present action against the University and the State of Washington for Dr. Jackson's alleged negligence and failure to obtain informed consent. A jury in the King County Superior Court exonerated the University and the State from negligence because Dr. Jackson did not breach the standard of care in deciding to treat Ashley with phototherapy, rather than a complete transfusion of her blood. The jury failed to reach a verdict on the informed consent claim. By agreement of the parties, this claim was then tried to the bench before the Honorable William Downing.
At trial, the parties presented conflicting expert testimony as to whether Ashley should have received a transfusion, essentially revisiting many of the issues already resolved by the jury in the negligence portion *953 of the case. The Backlunds' expert testified Ashley's risk factors placed her at higher risk of developing brain damage. They also testified a transfusion should have been performed when her bilirubin level reached anywhere from 17 to 22 mcg/dl, levels she exceeded from January 4 to January 9, 1988. They employed guidelines from a 1983 treatise which advocated transfusion when bilirubin levels reach 18 mcg/dl in full-term infants with risk factors. The Backlunds' experts concluded Ashley's risk of brain damage outweighed the risks associated with a transfusion.
The University's experts testified Ashley's condition did not reach the point where her risk of brain damage was as great as her risk of death or serious bodily harm from a transfusion. They testified the risk of permanent brain damage from phototherapy was 1 in 10,000. The risk of death from transfusion was estimated between .3 and 1.0 percent and the risk of serious adverse consequences was estimated at 4 to 5 percent. Dr. Jackson testified Ashley's risk of serious harm or death from the transfusion outweighed any risk of brain damage. Dr. Jackson testified he did not discuss transfusion with the Backlunds because he did not believe Ashley's condition was sufficiently serious to warrant such a treatment, and because "bringing it up before that point is unnecessary and causes more stress and distress in the family than is required." Verbatim Report of Proceedings at 224.
The trial court ruled for the University on the informed consent issue in a memorandum opinion,[1] finding a transfusion was a "recognized possible alternative form of treatment" for Ashley and "Dr. Jackson was aware of the possibility of a need imminently arising to transfuse this patient in order to prevent the neurological consequences that could result from her condition of hyperbilirubinemia." Clerk's Papers at *954 740, 742. The court found the possibility of a transfusion was a "material fact" of which the Backlunds were not aware. The court further found "continuing phototherapy and not performing a transfusion proximately caused injury to the patient." Clerk's Papers at 742.
The trial court, however, ultimately ruled in favor of the University finding the Backlunds did not carry their burden to establish the third element of the cause of action for breach of informed consent, that "a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts." RCW 7.70.050(1)(c).
In its ruling, the trial court emphasized a jury found Dr. Jackson's treatment of Ashley was not negligent. It would follow, explained the trial court, that Dr. Jackson would appropriately express his preferred course of treatment, phototherapy, not exchange transfusion. The trial court then stated a reasonably prudent patient would, and should, accept his or her physician's recommended treatment when such treatment conforms with the standard of care:
Dr. Jackson's viewpoint and his care of Ashley Backlund have been found by the jury and are found again by this court to be in compliance with the standard of care. In the face of the recommendations he would be expected to make a patient's representative concerning the alternative to an exchange transfusion, it cannot be said that such person would, with reasonable prudence, overrule his advice.
Clerk's Papers at 745.
The Backlunds moved for reconsideration, arguing the trial court actually resolved the factual dispute concerning the risks and benefits of undertaking an exchange transfusion in favor of the University. The trial court denied the motion, but "clarified" its memorandum opinion "to reflect its view that Dr. Jackson's treatment proposed and administered was not merely non-negligent but was correct." Clerk's Papers at 788. The trial court adopted the University's categorization of the risks of the two procedures:
It had been my intention to give a more ringing endorsement to Dr. Jackson's view of the progression of treatment modes and his categorization of the risks and benefits along the way....
The court did not simply find that Dr. Jackson's point of view and his treatment were within the standard care, but the court intended to make affirmative findings that his view of the progression of treatment modes and his categorization of the risks and benefits along the way were, in fact, accurate and proper and appropriate to be conveyed to a reasonably prudent patient or patient's representative.
Clerk's Papers at 797-98.
The Court of Appeals affirmed the judgment in an unpublished opinion, sustaining the trial court's determination, under these facts, that a reasonably prudent patient would not have chosen the transfusion therapy for Ashley's condition. Backlund v. University of Washington, No. 38341-8-I, 1997 WL 524028 (Wash.Ct.App. Aug.25, 1997). We granted review.

ANALYSIS
A. INFORMED CONSENT AND NEGLIGENCE
The initial question we must address is the University's contention the Backlunds had no cause of action for failure to obtain informed consent under RCW 7.70.050 as a matter of law where the jury exonerated Dr. Jackson and the University from liability for negligence. The University asks us to dismiss the Backlunds' complaint based on Dr. Jackson's failure to secure informed consent where Ashley's injury was not caused by Dr. Jackson's actual treatment. In effect, the University contends that because Dr. Jackson was exonerated from negligence by the jury for his alleged misdiagnosis of Ashley's condition (i.e., his decision that her condition was not so serious as to require transfusion instead of phototherapy), his failure to obtain informed consent did not proximately result in Ashley's harm and he could not be liable under RCW 7.70.050. We disagree with the University's argument on these facts.
We note the trial court here made reference to the conduct of Dr. Jackson being in compliance with the standard of care *955 as a factor in its decision on informed consent. The trial court's emphasis on the patient's likely following of the non-negligent recommendation of a physician goes too far in confusing negligence and informed consent claims. Negligence and informed consent are alternative methods of imposing liability on a health care practitioner. Informed consent allows a patient to recover damages from a physician even though the medical diagnosis or treatment was not negligent. See Thomas v. Wilfac, Inc., 65 Wash.App. 255, 261, 828 P.2d 597 (informed consent and medical negligence are alternative theories of liability), review denied, 119 Wash.2d 1020, 838 P.2d 692 (1992); Holt v. Nelson, 11 Wash.App. 230, 237, 523 P.2d 211, 69 A.L.R.3d 1235, review denied, 84 Wash.2d 1008 (1974). See also RCW 4.24.290 (actions based on professional negligence, "in no event shall ... apply to an action based on the failure to obtain the informed consent of a patient."); Harbeson v. Parke-Davis, Inc., 98 Wash.2d 460, 469-71, 656 P.2d 483 (1983) (explaining history of informed consent doctrine in Washington and noting the statutory distinction between informed consent actions and professional negligence actions). The Court of Appeals in Holt aptly explained that if a doctor breaches the
duty to obtain an informed consent from the patient before proceeding with treatment, the patient has a cause of action for damages against the doctor even if the doctor has performed the treatment properly within the standard of care of the profession. Thus, the cause of action can arise against a doctor for failing to obtain the patient's knowledgeable permission to the treatment even though the doctor's actions have not been negligent and would not give rise to a cause of action in any other way.
Holt, 11 Wash.App. at 237, 523 P.2d 211 (citations omitted).
In the appropriate case, treatment choice may fall within the classic professional negligence situation requiring the patient to prove the physician breached the standard of care. Bays v. St. Luke's Hosp., 63 Wash.App. 876, 880-83, 825 P.2d 319, review denied, 119 Wash.2d 1008, 833 P.2d 387 (1992); Burnet v. Spokane Ambulance, 54 Wash.App. 162, 168-69, 772 P.2d 1027, review denied, 113 Wash.2d 1005, 777 P.2d 1050 (1989). In Burnet, the court stated:
Informed consent focuses on the patient's right to know his bodily condition and to decide what should be done. RCW 7.70.050. Whenever a physician becomes aware of a condition which indicates risk to the patient's health, he has a duty to disclose it.
In response to Dr. Graham's liability, Thomas T. Reiley, M.D., an expert called on behalf of the Burnets, stated Dr. Graham was unaware of the risk of brain herniation and subsequent injury. The trial court determined that the issues presented were confined to negligence and misdiagnosis rather than a violation of the informed consent law. We agree; informed consent is an alternative method to impose liability. Thus, a high risk method of treatment rendered in a nonnegligent manner, but without an informed consent of the patient, may result in liability. That is not the situation here. It is undisputed Dr. Graham was unaware of Tristen's condition which implicated risk to her, so he had no duty to disclose. The Burnets' claim relates solely to issues of failure to meet the standard of care and diagnosis.
Burnet, 54 Wash.App. at 168-69, 772 P.2d 1027 (citations and footnote omitted). In Bays, noting the patient's attempt to disguise a negligence issue as a failure to obtain an informed consent issue, the court stated:
A failure to diagnose a condition ... is a matter of medical negligence. We decline to create a second or alternate cause of action on informed nonconsent to a diagnostic procedure predicated on the same facts necessary to establish a claim of medical negligence.
Bays, 63 Wash.App. at 883, 825 P.2d 319. See also Thomas, 65 Wash.App. at 261, 828 P.2d 597 (where physician (correctly) diagnosed asthma rather than Malathion poisoning, he did not breach duty to inform by failing to relate information regarding Malathion poisoning treatment because failure to diagnose a condition is a matter of medical *956 negligence, not a violation of the duty to inform a patient).
A physician who misdiagnoses the patient's condition, and is therefore unaware of an appropriate category of treatments or treatment alternatives, may properly be subject to a negligence action where such misdiagnosis breaches the standard of care, but may not be subject to an action based on failure to secure informed consent.[2]
We have no facts in this case, however, suggesting Dr. Jackson was unaware of the transfusion alternative.[3] Rather, in his professional judgment, he did not believe Ashley required a transfusion because her bilirubin levels were not serious enough to warrant such treatment. The jury upheld his professional judgment on that issue, but a trier of fact might still have found he did not sufficiently inform the patient of risks and alternatives in accordance with RCW 7.70.050. The University's contention, that an informed consent action is not present here as a matter of law because the patient's injury was not caused by the practitioner's actual treatment, fails.
B. PRIMA FACIE CASE UNDER RCW 7.70.050
Washington's informed consent statute is generally based on the policy judgment that patients have the right to make decisions about their own medical treatment. Keogan v. Holy Family Hosp., 95 Wash.2d 306, 313, 622 P.2d 1246 (1980) (origin of informed consent in tort of battery); Smith v. Shannon, 100 Wash.2d 26, 29, 666 P.2d 351 (1983) (informed consent premised on principle that every human being of adult years and sound mind has a right to determine what shall be done with his own body). See also Morinaga v. Vue, 85 Wash.App. 822, 829, 935 P.2d 637 (1997); Estate of Lapping v. Group Health Coop., 77 Wash.App. 612, 623, 892 P.2d 1116 (1995); Miller v. Kennedy, 11 Wash.App. 272, 281-90, 522 P.2d 852 (1974), aff'd, 85 Wash.2d 151, 530 P.2d 334 (1975).
*957 This concept of patient decisionmaking regarding treatment has sometimes been described as "patient sovereignty":
A patient has the sovereign choice of whether he will submit to surgery in the course of the diagnosis and treatment, and in order to make this choice meaningful and realistic the doctor is under a legal duty to disclose to a patient any serious risks involved in the contemplated surgery, and the alternatives available to him, including the risks from declining surgery.
Archer v. Galbraith, 18 Wash.App. 369, 377 n. 2, 567 P.2d 1155 (1977) (emphasis added) (citing Congrove v. Holmes, 37 Ohio Misc. 95, 104-05, 308 N.E.2d 765, 771 (1973)), review denied, 90 Wash.2d 1010 (1978).
A patient must be given sufficient information to make an informed health care decision. Shannon, 100 Wash.2d at 29, 666 P.2d 351. Accordingly, "it is for the patient to evaluate the risks of treatment and that the only role to be played by the physician is to provide the patient with information as to what those risks are." Id. at 30, 666 P.2d 351. RCW 7.70.050 indicates a patient must be advised of those "material facts" relating to the treatment; RCW 7.70.050(1) provides:
The following shall be necessary elements of proof that injury resulted from health care in a civil negligence case or arbitration involving the issue of the alleged breach of the duty to secure an informed consent by a patient or his representatives against a health care provider:
(a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
(b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
(c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
(d) That the treatment in question proximately caused injury to the patient.
A fact is deemed material for purposes of informed consent "if a reasonably prudent person in the position of the patient or his representative would attach significance to it deciding whether or not to submit to the proposed treatment." RCW 7.70.050(2). Material facts which must be established by expert testimony include:
(a) The nature and character of the treatment proposed and administered;
(b) The anticipated results of the treatment proposed and administered;
(c) The recognized possible alternative forms of treatment; or
(d) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment administered and in the recognized possible alternative forms of treatment, including nontreatment.
RCW 7.70.050(3). In a claim for lack of informed consent, the concept of patient sovereignty is bounded by the objective elements of proof for material facts required under RCW 7.70.050. See Edwin Rauzi, Informed Consent in Washington: Expanded Scope of Material Facts That the Physician Must Disclose to His Patient, 55 Wash. L.Rev. 655, 662, 664 (1980) (noting Washington applies an objective, rather than subjective, standard in informed consent cases, and such standard circumscribes to some extent the patient's power to choose).[4]
*958 In an informed consent case arising from a physician's failure to discuss alternatives to general anesthesia with a patient undergoing exploratory surgery, the trial court granted a directed verdict to the hospital on the ground that the plaintiff "failed to testify that he would have chosen an alternative treatment had he been apprised of the risks of general anesthesia and the available alternatives[.]" Brown, 41 Wash.App. at 572-73, 705 P.2d 781. The Court of Appeals reversed, reasoning "[t]he test is not whether Mr. Brown himself would have chosen a different course of treatment, but whether a reasonably prudent patient in Mr. Brown's position would have chosen a different course of treatment." Id. at 574, 705 P.2d 781 (citations omitted). The Court of Appeals appropriately emphasized the importance of the objective approach in Washington's informed consent law.
The dissent believes the majority opinion somehow undermines patient sovereignty. Dissent at 962. This is not the case. While a patient retains the right to make ultimate decisions regarding treatment he or she is to receive, if that patient chooses to bring an informed consent claim under RCW 7.70.050(1), any assertion that he or she would not have consented to the treatment received is judged under this objective standard. The relevant inquiry here is not whether the Backlunds would or would not have consented, but what a reasonably prudent patient/representative under similar circumstances would have done. RCW 7.70.050(1)(c). Our disposition of this case does nothing to undermine a patient's right to determine his or her own treatment, but requires such patient's assertion, that he or she would not have consented to such treatment, to be reasonable if the patient is to prevail on an informed consent claim.
In considering the elements set forth in RCW 7.70.050(1) for a prima facie case of failure to secure informed consent, the Backlunds proved three of the four statutory elements to the satisfaction of the trial court. The real question here is whether the Backlunds proved the third element of informed consent: whether a reasonable patient under similar circumstances would not have consented to the treatment if informed of the material fact or facts associated with such treatment.
The Backlunds ask us to redefine the third element of the cause of action so that RCW 7.70.050(1)(c) is satisfied if either of the following can be established by a preponderance of the evidence: (1) that "some patients, exercising reasonable prudence, might have opted for the recognized alternative treatment if informed of the material facts of which the doctor failed to inform the plaintiffs(s)," or (2) if "the recognized alternative treatment would have been among the range of reasonably prudent responses that patients could make upon being informed of the material facts of which the doctor failed to inform the plaintiff(s)." Pet. for Review at 14-15 (emphasis added).
We decline the Backlunds' invitation to rewrite RCW 7.70.050(1)(c). The Backlunds' test for the third statutory element essentially eliminates its objective feature. Their test would allow proof that some patients, exercising reasonable prudence, might have opted for the recognized alternative treatment if informed of the facts. Alternatively, the test is met if the recognized alternative treatment is among the range of reasonably prudent responses by patients had they been informed of the material facts. These alternatives would greatly diminish the proof necessary to establish an informed consent claim. The Legislature, however, clearly intended an objective test be employed with respect to this element of a prima facie case when it said the test involved a "reasonably prudent" patient. Brown, 41 Wash.App. at 574, 705 P.2d 781.
The Legislature has clearly stated what is required: the plaintiff must establish that "a *959 reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts[.]" RCW 7.70.050(1)(c). Thus, the trier of fact must determine from the evidence taken as a whole whether a reasonably prudent person in the patient's position would have chosen a different treatment than received. Archer v. Galbraith, 18 Wash.App. 369, 376, 567 P.2d 1155 (1977), review denied, 90 Wash.2d 1010 (1978); Holt v. Nelson, 11 Wash.App. 230, 236, 523 P.2d 211, 69 A.L.R.3d 1235, review denied, 84 Wash.2d 1008 (1974).
When determining whether a reasonably prudent patient would have declined treatment if informed of material facts regarding his or her treatment a trial court looks to the situation of the patient, i.e., his or her medical condition, age, risk factors, etc., and then the court makes findings of fact regarding the risks of the treatment and any material risks regarding treatment alternatives. Based on these findings along with any other relevant evidence, the trier of fact will ordinarily determine whether a reasonably prudent patient in the plaintiff's situation would have chosen a different treatment option. See Hutchinson v. United States, 915 F.2d 560 (9th Cir.1990) (where trial court's findings indicated patient's asthma was responding favorably to low-risk conservative drug treatment, which was discontinued in favor of another drug carrying substantial risk of crippling side effects, to which patient succumbed, reviewing court found such trial court findings showed a reasonable person in plaintiff's shoes would have continued the low-risk conservative drug treatment option had he been informed of the commensurate/concomitant risks of the alternative treatments); Canterbury v. Spence, 464 F.2d 772, 791 (D.C.Cir.1972) (the plaintiff may prevail in an informed consent cause of action "[i]f adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm"), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).
Under the statutory test, the trial court correctly ruled the Backlunds failed to establish the third element of the prima facie case of informed consent. This is essentially a case of failure of proof. A reasonably prudent patient would not have opted for the transfusion, even if the reasonably prudent patient had been informed of all the pertinent risks of no treatment, phototherapy, and the alternative treatment of double transfusion. We seriously doubt the Backlunds would have chosen no treatment for Ashley. The record below indicates there was a 1 in 10,000 chance the phototherapy treatment course employed by Dr. Jackson would result in the kind of permanent brain damage Ashley Backlund suffered. On the other hand, evidence also indicated there was a 1 in 300 to 1 in 100 chance of death if Ashley Backlund had been treated with a double transfusion of her blood.[5] Under these circumstances, in the absence of proof from the Backlunds to the contrary, no reasonably prudent patient/representative would prefer a treatment with a 1 in 100 chance of death of their baby to the more conservative course of treatment within the standard of care that bears a 1 in 10,000 chance of permanent brain damage. The record indicates the Backlunds simply did not bear their burden of proof with respect to the reasonableness of a patient's consideration of the treatment alternatives.[6] On this basis, the trial *960 court's judgment dismissing the Backlund's informed consent claim is affirmed. See Redding v. Virginia Mason Med. Ctr., 75 Wash.App. 424, 426, 878 P.2d 483 (1994); Hadley v. Cowan, 60 Wash.App. 433, 444, 804 P.2d 1271 (1991); LaMon v. Butler, 112 Wash.2d 193, 200-01, 770 P.2d 1027 (reviewing court may affirm a trial court's judgment on any basis supported by the record), cert. denied, 493 U.S. 814, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989).

CONCLUSION
Under the facts of this case, the Backlunds simply did not sustain their burden of proof with respect to a prima facie case of failure to obtain informed consent under RCW 7.70.050. We affirm the trial court's judgment dismissing the Backlunds' complaint.
GUY, C.J., and DURHAM, J., JOHNSON, J. and DOLLIVER, J.P.T., concur.
MADSEN, J. (dissenting)
After correctly identifying the legal principles applicable in this case, the majority then unaccountably departs from appellate review and steps into the role of trial court and becomes trier of fact. The majority decides that the facts do not support plaintiffs' claim. Unfortunately, the majority's decision to act as trial judge is improper. First, this court's role is not that of a finder of fact. Second, the majority's "findings of fact" are incomplete and one-sided. Adding the appellate errors on to the trial court errors compounds the miscarriage of justice which occurred in this casethe trial court applied the wrong legal standard and refused to enter findings of fact, and now this court inappropriately and wrongly determines the facts. Plaintiffs are entitled to more.
Here, the trial court refused to enter findings of fact despite the University of Washington's request to do so. CR 52 requires formal written findings on all disputed facts. "[F]indings must be made on all material issues in order to inform the appellate court as to `what questions were decided by the trial court, and the manner in which they were decided....'" Federal Signal Corp. v. Safety Factors, Inc., 125 Wash.2d 413, 422, 886 P.2d 172 (1994) (quoting Daughtry v. Jet Aeration Co., 91 Wash.2d 704, 707, 592 P.2d 631 (1979)) (additional citations and quotation marks omitted). In the face of the trial court's omission, the majority "finds" its own facts in order to decide whether plaintiffs have made a sufficient case of informed consent. The majority justifies its approach by acknowledging that the trial court's memorandum *961 decision is "lacking in some key respects" but concludes that it is sufficient "along with the record" to decide this case. Majority at 953 n.1.
The correct course, in the absence of findings, is not for this court to search the record and make its own findings, but to direct that factual determinations be made by the trier of fact. See Federal Signal, 125 Wash.2d at 423, 445, 886 P.2d 172.
Moreover, the majority's resort in part to the trial court's written memorandum is particularly disturbing because the trial court not only failed to make formal findings as required, but applied the wrong legal standard. It cannot be said with confidence that the trial court's erroneous view of the law did not affect its view of the evidence. Indeed, the contrary seems more likely. The trial court incorrectly applied the "reasonably prudent person" standard to mean that a reasonably prudent person would, and should, accept his or her physician's recommended treatment when that treatment conforms to the standard of care. Clerk's Papers (CP) at 745. This view is wrong because it conflicts with the principle of patient sovereignty upon which the informed consent doctrine is based. The question is not what the physician thinks is best or what the physician thinks should be revealed. The trial court's reasoning is also wrong because compliance with the standard of care for treatment actually given has nothing to do with the question of whether a reasonably prudent person would not have consented to treatment if informed of undisclosed material facts. RCW 7.70.050(1)(c). As the majority recognizes, it is improper to inject a negligence requirement into the informed consent cause of action.
Following plaintiffs' motion for reconsideration, the trial court sought to clarify its decision. Its statements reveal, however, its continued reliance on incorrect principles. The trial court confirmed its view that the standard of care was not only satisfied but that the doctor's actions and assessments of the risks were correct and appropriate to be conveyed to a reasonably prudent patient. CP at 797-98. The trial court's decision was based upon the improper premise that a reasonable patient would necessarily choose a course of action because a physician recommends it.
It is, however, the patient's decision, not the physician's. "There is no room for paternalism or for overprotectiveness." Miller v. Kennedy, 11 Wash.App. 272, 286, 522 P.2d 852 (1974), aff'd, 85 Wash.2d 151, 530 P.2d 334 (1975). Moreover, even if a doctor's assessment of a particular risk is accurate, that does not mean that a reasonably prudent patient would not choose alternate treatment despite the risk. See Archer v. Galbraith, 18 Wash.App. 369, 378, 567 P.2d 1155 (1977).
Thus, whatever "facts" are to be gleaned or inferred from the trial court's memorandum, they have been determined with the wrong standard in mind. The majority says, though, that "[t]he trial judge as fact finder below accepted the quantifications of [the] risks as defined by the defendant." Majority at 959 n.5. Given the trial court's propensity to give weight to the treating physician's assessments and recommendations in light of the wrong legal standard it embraced, this court should not simply accept the trial court's endorsement of the treating physician's assessment. Yet that is what the majority does. Majority at 959 n.5 (citing Dr. Jackson's testimony as to a seriously ill patient's risk of death from exchange transfusions).
The proper resolution is for this matter to be retried under the right legal principles. The majority reasons, however, that retrial is not required because the facts which it finds show that plaintiffs could not possibly prevail  that plaintiffs' have not made out a prima facie case. This is so, the majority says, because no reasonably prudent patient would "prefer a treatment with a 1 in 100 chance of death of their baby to the more conservative course of treatment within the standard of care that bears a 1 in 10,000 chance of permanent brain damage." Majority at 959.
The majority's reduction of this case to a pair of statistics comprising a very small part of the expert testimony provided is troubling. First, there is no principled basis for saying *962 this comparison of a single pair of ratios can account for the choice parents face when their newborn infant is in medical distress like Ashley was. Further, the Backlunds' experts testified that Ashley's risk factors placed her at a higher risk of developing bilirubin encephalopathy. These factors included respiratory distress syndrome, severe respiratory acidosis, low pH, elevated carbon dioxide tension in the bloodstream, hypertension, prematurity, and low Apgar scores. Experts also testified Ashley's condition on the sixth day showed a neurological change, indicated by evidence the baby was posturing in her lower extremities and lacked a Moro reflex and grasp. The Backlunds' experts testified that a transfusion should have been performed when Ashley's bilirubin level reached anywhere from 17 to 22 mcg/dl, levels she exceeded from January 4 to January 9, 1988. Guidelines in the then current 1983 Troug and Hodsen treatise, "Critical Care of the Newborn" advocated an exchange transfusion to prevent encephalopathy when bilirubin levels reached 18 mcg/dl in full-term infants with respiratory distress or hypoxia. Verbatim Report of Proceedings at 93. The risk of death from exchange transfusion was estimated between .3 and 1.0 percent and the risk of morbidity was estimated at 4 to 5 percent. The Backlunds' experts concluded that Ashley's risk of encephalopathy outweighed the risks associated with an exchange transfusion.
There was, of course, controverting testimony. However, in the face of this evidence it cannot be fairly said that plaintiffs have failed to produce evidence sufficient to have their informed consent claim tried under the proper legal standards.[1]
Finally, the majority's decision in this case prompts the question: Of what use is the statutory cause of action for lack of informed consent if it cannot be maintained in this case? The cause of action based upon lack of informed consent is intended to assure that patients have the right to make decisions about their medical treatment. Absolutely essential to that right is the requirement that the patient be given the information necessary to make informed decisions. Plaintiffs' infant daughter Ashley suffered brain damage after being given phototherapy treatment for jaundice. Other treatments were available, but Ashley's parents were never advised of alternatives. Contrary to the majority's limited view of the evidence offered, plaintiffs presented sufficient evidence from which a trier of fact could conclude that reasonably prudent people in their position would have selected the alternative treatment. Plaintiffs are entitled to a trial on their informed consent claim under correct legal standards.
Patient sovereignty and disclosure of material information by treating physicians are hollow ideals if this court simply sanctions the trial court's view that doctor knows best. There is abundant evidence in this case from which a trier of fact could determine that material information was not disclosed and that a reasonably prudent patient or patient's representative in the same circumstances here reasonably prudent parents faced with an agonizing decision about their infant daughterwould have opted for an exchange transfusion rather than phototherapy. This case should be remanded for trial. This court should not put itself in the position of finder of fact.
Although the majority states the correct legal standards to be applied in this case, I dissent because the majority's view that this court should search the record for evidence to support "the ultimate determination of the trier of fact on alternative grounds" is nothing short of a usurpation of the trial court's role as trier of fact. Majority at 960 n.6.
ALEXANDER, J., and SANDERS, J., concur.
NOTES
[1] The trial court did not include formal findings of fact and conclusions of law in its memorandum decision as required by CR 52(a)(4) which endorses memorandum opinions if findings and conclusions are included. As the prevailing party, the University asked the trial court to enter written findings. Peoples Nat'l Bank v. Birney's Enters., Inc., 54 Wash.App. 668, 670, 775 P.2d 466 (1989) (prevailing party has duty to procure findings). The University was concerned the absence of written findings and conclusions would impede appellate review. The trial court noted the concern, declined to enter findings, and instead directed the parties to reach an agreement on a set of basic "operative undisputed facts," such as Ashley's date of birth.

We are loath to penalize the University for the trial court's ill-advised refusal to comply with CR 52(a)(4). The trial court's memorandum decision, while lacking in some key respects, is, nevertheless, along with the record, sufficient to address the issue of whether the trial court misapplied the informed consent statute. The absence of formal findings and conclusions in a memorandum opinion is not invariably fatal if we can discern what questions the trial court decided and the theory for the decision. Knudsen v. Patton, 26 Wash.App. 134, 135 n. 1, 611 P.2d 1354, review denied, 94 Wash.2d 1008 (1980). See also In re Welfare of Todd, 68 Wash.2d 587, 592-93, 414 P.2d 605 (1966). But we encourage the inclusion of formal findings in memorandum opinions, as directed by CR 52(a)(4), as an aid to appellate review. We also specifically preserve the option of appellate courts to remand for findings of fact as necessary to facilitate such review.
Although the dissent criticizes our determination of this case without requiring remand, under the unique circumstances presented here, judicial economy, as well as ultimate fairness to the parties, is better served by our retention of this case and disposition as stated herein. Our holding in Federal Signal Corp. v. Safety Factors, Inc., 125 Wash.2d 413, 886 P.2d 172 (1994), upon which the dissent relies, see Dissent at 960, does not require a different disposition. While we deemed remand for findings of fact appropriate in that case, nothing therein supports the notion that the absence of findings requires a complete retrial in every case or the dissent's contention that a complete retrial is required here. See Dissent at 960-61. Indeed, as we noted above, the absence of findings is not invariably fatal to a trial court's determination. See In the Matter of the Marriage of (Griffin) Booth, 114 Wash.2d 772, 777, 791 P.2d 519 (1990) ("In the absence of a written finding on a particular issue, an appellate court may look to the oral opinion to determine the basis for the trial court's resolution of the issue."); Womble v. Local Union 73 of Intern. Broth. of Elec. Workers, AFL-CIO, 64 Wash.App. 698, 702, 826 P.2d 224, review denied, 119 Wash.2d 1018, 838 P.2d 691 (1992) ("In the absence of a specific finding on a particular issue, an appellate court may look to the court's written memorandum opinion to determine the basis for the court's resolution of the issue."); Anderson v. Valley Quality Homes, Inc., 84 Wash. App. 511, 522, 928 P.2d 1143, review denied, 132 Wash.2d 1002, 939 P.2d 215 (1997) (using memorandum opinion to clarify findings).
[2] In the traditional informed consent case, a physician diagnoses the patient's condition and recommends a course of treatment. The physician is liable under RCW 7.70.050, however, if the physician fails to disclose the attendant risks of such treatment. Similarly, the physician is liable if the physician fails to disclose other courses of treatment, including no treatment at all, as options upon which the patient makes the ultimate choice. See, e.g., Brown v. Dahl, 41 Wash.App. 565, 570, 705 P.2d 781 (1985) ("duty to disclose similarly attaches to recognized possible alternative forms of treatment and to the anticipated results of the treatment proposed and administered" (quoting Adams v. Richland Clinic, Inc., 37 Wash.App. 650, 656-59, 681 P.2d 1305 (1984))).

Where a physician arguably misdiagnoses the patient's condition and recommends a course of treatment for the patient based on that misdiagnosis, the physician is properly liable in negligence for the misdiagnosis if such diagnosis breaches the standard of care. But the physician should not be additionally liable under RCW 7.70.050 for a condition unknown to the physician. For example, a physician who misdiagnosed a headache as a transitory problem and failed to detect a brain tumor may be guilty of negligence for the misdiagnosis, but it seems anomalous to hold the physician culpable under RCW 7.70.050 for failing to secure the patient's informed consent for treatment for the undetected tumor. Cf. Thomas, 65 Wash.App. at 261, 828 P.2d 597.
[3] A physician must disclose only those risks and alternative treatments that are "material."

The doctrine does not place upon the physician a duty to explain all possible risks, but only those of a serious nature. The guide for disclosure is the test of materiality, which is an objective one, but incorporates the underlying concept of "patient sovereignty". That is, if the reasonable person in the patient's position would attach significance to a risk in deciding treatment, the risk is material. The duty to disclose similarly attaches to recognized possible alternative forms of treatment and to the anticipated results of the treatment proposed and administered.
Brown, 41 Wash.App. at 570, 705 P.2d 781 (citations omitted) (emphasis added); Adams v. Richland Clinic, Inc., 37 Wash.App. 650, 656, 681 P.2d 1305 (1984) (informed consent doctrine does not place upon the physician a duty to explain all possible risks, but only those of a serious nature; the guide for disclosure is the test of materiality, which is an objective one, but incorporates the underlying concept of "patient sovereignty") (citing cases), While the trial court here accepted defendant's quantification of the risks associated with a double exchange transfusion, see note 5 infra below, it also found the possibility of such transfusion to be a "material fact" of which the Backlunds were unaware. Clerk's Papers at 740-42. The University and Dr. Jackson do not dispute this.
[4] In adopting an objective standard regarding causation, Washington follows the majority view:

To recover under the doctrine of informed consent, as in all negligence cases, there must be a causal connection between the breach of duty by the defendant and the injuries suffered by the plaintiff. Some states have adopted a subjective standard, requiring the plaintiff to testify or otherwise prove that she would not have consented to the proposed treatment if she had been fully informed. See, e.g., Scott v. Bradford, 606 P.2d 554 (Okla.1979); Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676 (1972). A second test, and the one used by the vast majority of the states, is based upon an objective standard. Under this test the question becomes whether or not a reasonably prudent patient, fully advised of the material known risks, would have consented to the suggested treatment.
The problem with the subjective test was pointed out by the California Supreme Court in the case of Cobbs v. Grant, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972), wherein it is stated:
"Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so with the 20-20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment."
104 Cal.Rptr. at 516-517, 502 P.2d at 11-12.
Reikes v. Martin, 471 So.2d 385, 392-93 (Miss. 1985).
[5] The record contains much and varied testimony and other evidence regarding the quantification of risks associated with phototherapy and double volume exchange transfusions. The trial judge as fact finder below accepted the quantifications of such risks as defined by the defendant. See Clerk's Papers at 628, 763, 797-98, 804. See also Report of Proceedings at 275-76 (Dr. Jackson's testimony indicating for seriously ill patients, death from exchange transfusion could range as high as 4 percent).
[6] The trial court did not carefully delineate whether its ruling on causation was a legal or factual decision. But as this was a bench trial, the parties having agreed to submit the informed consent issue to the trial court, the decision regarding what a reasonably prudent patient would do was properly entrusted to the trial court. The trial court effectively accepted the facts argued by the University. See supra.

The dissent argues, because the trial court applied an improper legal standard, we should not accept its assessment as trier of fact. See Dissent at 961 ("It cannot be said with confidence that the trial court's erroneous view of the law did not affect its view of the evidence."). First, we note the legal standard criticized by the dissent (i.e., that a patient would likely follow the advice of a physician) we have also rejected. See discussion supra at 10. Majority op. at 955. It does not follow, however, that the trial court's evaluation of the evidence was necessarily flawed or that its ultimate factual determination is indefensible.
The dissent chides the majority for "simply accept[ing] the trial court's endorsement of the treating physician's assessment." Dissent at 961 (referencing supra note 5). We have only acknowledged, however, that the trial court performed its proper function as trier of fact after considering all evidence presented by both sides. See supra note 5. Where, as in this case, a "battle of experts" is presented, we are not at liberty to ignore the trier of fact's determinations of fact issues, as the dissent suggests. See Fisher Properties, Inc. v. Arden-Mayfair, Inc., 115 Wash.2d 364, 369, 798 P.2d 799 (1990) (recognizing the trial court in a bench trial is in a better position to evaluate the credibility of witnesses and holding a reviewing court will not substitute its judgement regarding such trial court's factual determinations).
Here both sides relied on multiple experts and conflicting evidence was presented to the trier of fact. Under such circumstances, the record contains sufficient evidence to support the trier of fact's determination. Although the dissent clearly dislikes the trier of fact's determination here, as sufficient evidence appears in the record to support that determination, we are not free to simply disregard it at our whim.
Furthermore, the mere presence of evidence favorable to the Backlunds does not require retrial of this case as the dissent contends. See Dissent at 962 (noting evidence favoring the Backlunds and concluding "in the face of this evidence it cannot be fairly said that plaintiffs' have failed to produce evidence sufficient to have their informed consent claim tried under the proper legal standards"). Were we reviewing a grant of summary judgment in favor of the University, such evidence would indeed be relevant to our inquiry. Such is not the case here, however. We are reviewing a bench trial decision, and affirming the ultimate determination of the trier of fact on alternative grounds.
[1] Indeed, trial of the Backlunds' informed consent claim resulted in a hung jury before it was resolved by the trial court, indicating sufficient evidence existed on each element of the cause of action.