2017 JAN 23 A. II: C


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| In the Matter of the Welfare of<br><br>Q.T., DOB 01//22/06;<br>J.B., DOB 112/17/13,<br><br>Minor Children under the age of 18.<br><br>———————————————<br><br>WASHINGTON STATE DEPARTMENT<br>OF SOCIAL & HEALTH SERVICES,<br><br>        Respondent,<br><br>v.<br><br>CORRIE ROSIER,<br><br>        Appellant. | No. 74348-1-I<br><br><br><br><br><br><br><br><br><br><br><br>UNPUBLISHED OPINION<br><br>FILED: January 23, 2017 |

VERELLEN, C.J. — Corrie Rosier appeals the trial court's order terminating her parental rights to her two children. Rosier challenges the trial court's finding that she was currently unfit to parent the children. She also challenges the trial court's denial of her motion to reconsider or vacate the termination order based on new evidence. We affirm.

## FACTS

Rosier is the mother of daughter Q.T., born January 22, 2006, and son J.B., born November 17, 2013.[1] The Department first became involved with Rosier when Q.T. was born prematurely and Rosier tested positive for cocaine at the hospital. Q.T. was placed for several weeks at Pediatric Interim Care Center, a facility for babies prenatally exposed to drugs. Rosier agreed to participate in a substance abuse evaluation and random urinalysis testing, and Q.T. was returned to her care.

In November 2011, Rosier's 11-month-old daughter S.R. drowned in a bathtub while in Rosier's care. Officers investigating the incident reported that Rosier "appeared slow and lethargic and did not appear to know her address."[2] The Department filed a dependency petition and Q.T. was placed in foster care. The court ordered Rosier to participate in a substance abuse evaluation and any recommended treatment, random urinalysis testing twice a week, mental health counseling and a parenting assessment.

In May 2012, based on the recommendations of her substance abuse evaluation, Rosier entered inpatient substance abuse treatment at Recovery Centers of King County. However, a couple of months after graduating from the program, Rosier tested positive for oxycodone. Rosier was referred to several different outpatient substance abuse treatment programs but did not comply or complete any of them.

---

[1] Rule also has four other children: a son, M.R., who was over the age of 18 at the time of the termination trial, twins O.R-T. and D.R-T., who live with their father in California, and a daughter, N.T., who lived with her father in Washington. These children are not at issue in this appeal.

[2] Clerk's Papers (CP) at 7.

In March 2013, Rosier moved into Passage Point, a supportive housing program for parents and children that offers services and case management. During this time, Rosier continued to use alcohol, opiates and methamphetamine, despite knowing she was pregnant with J.B. Department social worker Kristie Archie and court-appointed special advocate (CASA) David Wilma both observed Rosier attend at least one meeting with the Department while under the influence of drugs.

In November 2013, Rosier gave birth to J.B. At the hospital. Rosier denied ever having used drugs in the past. However, hospital staff noted concern that Rosier continually requested high doses of painkillers despite having a relatively uncomplicated delivery. The Department filed a dependency petition and J.B. was placed in foster care. Urinalysis testing showed that Rosier continued to use opiates and methamphetamine. Rosier also sometimes fell asleep at visits with Q.T. and J.B.

In June 2014, Rosier entered Family Treatment Court, a specialized dependency court in King County that provides extra support and services for parents with substance abuse issues. Rosier continued to test positive for alcohol and methamphetamine use. Rosier was also caught forging signatures that she used as proof of her attendance at AA/NA meetings. In August 2014, Rosier was referred to Prosperity Counseling and Treatment Services, an inpatient facility for women with mental health and substance abuse issues. The facility discharged Rosier in a little over two weeks for noncompliance with program rules and disruptive behavior. Rosier was discharged from Family Treatment Court in part for her continued substance use and failure to comply with treatment.

In November 2014, Sue D'Williss, who had previously been a visit supervisor for Rosier's visits, offered to care for the children. The Department began the process of transitioning Q.T. to D'Williss's home. D'Williss allowed Rosier to live in a mother-in-law apartment on the property and to have liberal contact with the children, on the condition that Rosier refrain from using drugs and alcohol. A few days later, D'Williss took Rosier grocery shopping and Rosier bought alcohol. D'Williss reminded Rosier that she could not stay on the property if she drank it. Rosier consumed so much alcohol that D'Williss could not awaken her the following morning. D'Williss told Rosier she could no longer live there.

The Department filed a termination petition as to both children, alleging that Rosier's continued substance use made her unfit to parent the children. Even after the petition was filed, Rosier continued to use methamphetamine and cocaine.

Trial on the petition took place between August 3 and September 2, 2015. At the time of trial, Q.T. was nine years old and J.B. was almost two years old. Q.T. had been out of Rosier's care for nearly four years and J.B. had never lived with Rosier. The trial court heard testimony from 28 witnesses and reviewed 109 exhibits. On October 28, 2015, the trial court entered findings of fact and conclusions of law and an order terminating Rosier's parental rights.

On November 2, 2015, Rosier filed a motion for reconsideration under CR 59(a) and for relief from judgment under CR 60(b), arguing that she had continued to make progress in her services during the two months between the close of evidence

and the entry of the termination order. The trial court denied the motion. Rosier appeals.[3]

## ANALYSIS

Parental rights are a fundamental liberty interest protected by the United States Constitution.[4] To terminate parental rights, the State must satisfy a two-step test. First, it must prove each of six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; [and]

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[5]

If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that

---

[3] The fathers of Q.T. and J.B. are unknown. Their parental rights were terminated in December 2014 and June 2015, respectively, and they are not parties to this appeal.

[4] Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[5] RCW 13.34.180(1).

termination is in the "best interests" of the child.[6]

In addition to the statutory prerequisites, the State must also prove that the parent is "currently unfit to parent."[7] In order to prove unfitness, the State must show that the parent's deficiencies make him or her incapable of providing "'basic nurture, health, or safety.'"[8] "Where a trial court finds that the six statutory prerequisites have been met, this constitutes an implicit finding of unfitness."[9]

Findings of fact must be supported by substantial evidence.[10] Unchallenged findings of fact are verities on appeal.[11] In determining whether substantial evidence supports the trial court's findings, we will not weigh the evidence or the credibility of witnesses.[12]

### Parental Unfitness and Likelihood of Reunification

Rosier contends the trial court erred in finding she was unfit to parent because the Department failed to demonstrate a nexus between her substance abuse and her parenting abilities. She contends that without a finding of unfitness, the Department cannot establish the "little likelihood" element in RCW 13.34.180(1)(e). We disagree. The trial court's findings that Rosier was currently unfit and that there was little

---

[6] RCW 13.34.190(1).

[7] Matter of B.P. v. H.O., 186 Wn.2d 292, 312-13, 376 P.3d 350 (2016).

[8] Id. at 313 (quoting In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2004)).

[9] Id.

[10] In re Dependency of K.N.J., 171 Wn.2d 568, 577, 257 P.3d 522 (2011).

[11] In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

[12] In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

likelihood the children could be returned to her in the near future were supported by substantial evidence.

Here, Rosier's primary parental deficiency was her substance abuse. Rosier stipulated in J.B.'s dependency order that she "has a history of drug and excessive alcohol use" and that this was a basis for removal because "[t]he child has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the children's psychological or physical development."[13] When a parent agrees to facts in a dependency order, the Department is not required to reprove these facts in a termination proceeding.[14]

A finding of unfitness, however, requires more than the determination that a parental deficiency exists.[15] Here, the record supports the finding that Rosier's drug use and her refusal to acknowledge its impact rendered her unfit to parent the children. Both Q.T. and J.B. were removed from Rosier's care at birth because of Rosier's drug use. At a Department meeting in March 2013, Rosier wanted Q.T. placed with her, but Rosier showed up to the meeting while under the influence. Rosier lost several valuable opportunities to reunify with her children, such as Family Treatment Court and living with the D'Williss family, because of her substance use. Rosier even continued to use drugs after the Department filed a termination petition and she was aware that her parental rights could be terminated.

---

[13] Ex. 22 (Findings 2 & 2.3).

[14] In re Dependency of K.R., 128 Wn.2d 129, 141-42, 904 P.2d 1132 (1995).

[15] In re Matter of K.M.M., 186 Wn.2d 466, 493, 379 P.3d 75 (2016).

Several witnesses testified regarding the nexus between substance use and parenting ability. When asked why Rosier's sobriety was critical, the court appointed special advocate (CASA) David Wilma testified, "Because the mother had been documented as using drugs and alcohol and they were impacting her ability to perform as a parent and to sustain employment."[16] According to Tara Wetmore, Rosier's chemical dependency treatment provider, the fact that Rosier "wasn't staying sober and . . . wasn't showing up for UAs" even though she wanted to regain custody of her children indicated that "despite consequences[,] she cannot control her use."[17] Pauline Duke, the children's guardian ad litem, testified that a parent using drugs could not meet Q.T. and J.B.'s particularized needs for structure and stability. And Chad Baker, a Department social worker, testified that substance abuse was a risk to children because "it alters a parent's ability to be able to make sound judgment, it alters the parent's ability to be able to maneuver their environment in a safe and stable way. It increases the likelihood that a parent will have or engage in risky behaviors in which they normally may not, it—there's a . . . likelihood that a parent using substances may place their children in dangerous situations or around people who may."[18]

Relying on In re Welfare of C.B.,[19] Rosier argues that the court could not rely solely on her past history of drug use in making the "little likelihood" finding. But C.B. is not analogous. In C.B., the Department originally removed the children from the

---

[16] Report of Proceedings (RP) (Aug. 4, 2015) at 267.

[17] RP (Aug. 11, 2015) at 759.

[18] RP (Aug. 10, 2015) at 497.

[19] 134 Wn. App. 942, 143 P.3d 846 (2006)

mother due to her lengthy history of drug use. By the time of trial, the mother had nearly completed a substance abuse treatment program and the evidence was undisputed that "she was doing well in her recovery" and her prognosis for sustained sobriety was good.[20] The court held that, once a parent shows that "she has been improving" the State may not rely "solely on past performance to prove that it is highly probable that there is little likelihood that the parent will be reunited with her children in the near future."[21]

Here, however, the trial court's finding that reunification would not occur in the near future was not premised merely on the mother's past failed treatment attempts. Instead, several witnesses testified that it would take between six months and a year to transition J.B. and Q.T. to Rosier's care. And this timeline assumed that Rosier was fully participating in substance abuse treatment, something she had never done during the lengthy dependency proceedings. The trial court did not err in finding that Rosier's failure to adequately address her substance use rendered her currently unfit to parent, nor in finding that there was little likelihood that the children could have been returned to Rosier in the near future.

### CR 59 and CR 60

After the trial court entered its written findings of fact and conclusions of law terminating Rosier's parental rights, Rosier sought reconsideration based on CR 59(a)(4), "newly discovered evidence . . . which the party could not with reasonable diligence have discovered and produced at the trial" and CR 59(a)(9), where

---

[20] C.B., 134 Wn. App. at 959.

[21] Id. at 953

"substantial justice has not been done." Rosier also moved for relief under

CR 60(b)(11), which allows for a judgment to be vacated for "[a]ny other reason

justifying relief from the operation of the judgment." In support of her motion, Rosier

provided (1) a letter from her mental health therapist stating that Rosier attended her

appointments in June, July, August and October, (2) reports from her chemical

dependency treatment group from July, August and September stating that Rosier

was in partial compliance with treatment, and (3) negative urinalysis test results for

the months of April, July, August, September and October.

The trial court denied the motion. The order reads, in relevant part, as follows:

2) The mother's motion for reconsideration under CR 59 is DENIED;

3) The mother's motion to set aside the judgment under CR 60 is
DENIED because she failed to seek an order to show cause under
CR and LCR 60(e) and she has not shown that substantial justice was
not done under CR 60(b)(11).[22]

This court reviews the denial of a motion under CR 59 or CR 60 for abuse of

discretion.[23] A trial court abuses its discretion only if its decision is manifestly

unreasonable or based on untenable grounds or reasons.[24]

Rosier contends that the trial court abused its discretion in denying her request

for relief under CR 59 because it summarily denied the motion without giving a basis

---

[22] CP at 742-43.

[23] Isla Verde Int'l Holdings, Inc. v. City of Camas, 99 Wn. App. 127, 142, 990 P.2d 429 (1999).

[24] Clark v. Teng, 195 Wn. App. 482, 492, 380 P.3d 73 (2016).

for its ruling. But we may affirm a trial court's decision on any basis supported by the record.[25]

Here, Rosier failed to establish that she had newly discovered evidence justifying reconsideration of the termination order. To support a motion for reconsideration, "newly discovered evidence" must (1) probably change the result of the trial; (2) be discovered after the trial; (3) not have been discoverable before trial by the exercise of due diligence; (4) be material; and (5) be more than merely cumulative or impeaching.[26] The absence of any one of these five factors justifies the denial of a motion for reconsideration.[27] Much of the evidence Rosier sought to introduce was already before the trial court. And the remaining evidence regarding her participation in September and October would not have changed the result because it was insufficient to overcome the evidence of years of noncompliance.

Nor does Rosier establish that substantial justice was not done. The basic question posed by this ground "is whether the losing party received a fair trial."[28] "Courts rarely grant reconsideration under CR 59(a)(9) for lack of substantial justice because of the other broad grounds afforded under CR 59(a)."[29] Here, the trial court heard testimony from 28 witnesses and reviewed 109 exhibits over the course of 13 days of trial. Rosier does not establish that she received anything less than a fair trial.

---

[25] Backlund v. Univ. of Washington, 137 Wn.2d 651, 670, 975 P.2d 950 (1999) (citing LaMon v. Butler, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989)).

[26] Holaday v. Merceri, 49 Wn. App. 321, 329, 742 P.2d 127 (1987).

[27] Id. at 330.

[28] Baxter v. Greyhound Corp., 65 Wn.2d 421, 440, 397 P.2d 857 (1964).

[29] Sligar v. Odell, 156 Wn. App. 720, 734, 233 P.3d 914 (2010)

Rosier argues that trial court denied her CR 60 motion based on the wrong legal standard because "substantial justice" is the standard for a CR 59(a)(9) motion. Again, however, we may affirm on any basis supported by the record. Rosier did not demonstrate she was entitled to relief under CR 60(b)(11). Despite its broad language, the use of CR 60(b)(11) is "not a blanket provision authorizing reconsideration for all conceivable reasons."[30] Instead, the use of CR 60(b)(11) is confined to situations involving "'extraordinary circumstances, which constitute irregularities extraneous to the proceeding.'"[31] Rosier's participation in services for a two-month period is not an extraordinary circumstance in light of the length of the dependency proceedings.

In the alternative, Rosier contends that because nearly two months elapsed between the close of evidence and the entry of the termination order, due process required the trial court to reopen the termination proceedings and consider her new evidence. But "the statute does not require that termination orders be entered within a specified period after the fact-finding hearing, and the trial evidence does not evaporate with the passage of time. Whether delay requires reopening the evidence on the issue of current unfitness is an inquiry into what (if anything) has meaningfully changed."[32]

As discussed above, Rosier failed to demonstrate that anything had meaningfully changed after the close of evidence. Rosier offered evidence that she

---

[30] State v. Keller, 32 Wn. App. 135, 141, 647 P.2d 35 (1982).

[31] Union Bank, N.A. v. Vanderhoek Assocs., LLC, 191 Wn. App. 836, 845, 365 P.3d 223 (2015) (quoting State v. Ward, 125 Wn. App. 374, 379, 104 P.3d 751 (2005)) (internal quotation marks omitted).

[32] In re Dependency of T.R., 108 Wn. App. 149, 158, 29 P.3d 1275 (2001).

was participating in most of her sessions with her substance abuse treatment provider. But her treatment provider testified at trial that he had to put Rosier on a reduced frequency schedule because otherwise, Rosier missed too many sessions. And while Rosier submitted evidence of some clean urinalysis tests, the dates on the tests indicate that there was at least one week during which Rosier did not submit any urinalysis samples. Due process did not warrant reopening the termination proceedings.

We affirm the trial court's order terminating Rosier's parental rights.

WE CONCUR: