# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| THOMAS P. COLLINS, | No. 52552-6-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| JUERGENS CHIROPRACTIC, PLLC; and CHRIS J. JUERGENS, D.C., | |
| Respondents. | |

MAXA, J. – Thomas Collins appeals the trial court's dismissal on summary judgment of a lawsuit he filed against Chris Juergens, D.C. and Juergens Chiropractic, PLLC (collectively, Dr. Juergens). Dr. Juergens performed a chiropractic manipulation on Collins's neck, which caused a vertebral artery dissection and resulted in a stroke. Collins argues that Dr. Juergens was negligent in failing to conduct a proper pretreatment work-up before performing the manipulation and that Dr. Juergens failed to obtain informed consent because he did not advise Collins that the manipulation could cause a stroke.

We hold that (1) the trial court did not err in dismissing Collins's medical negligence claim because he failed to create a genuine issue of material fact on whether the failure to conduct a pretreatment work-up was the proximate cause of his injury, and (2) the trial court erred in dismissing Collins's lack of informed consent claim because there are genuine issues of

material fact regarding the materiality of the risk of stroke and whether a reasonable person in his position would not have consented to a neck manipulation if informed of the risk.

Accordingly, we affirm the trial court's grant of summary judgment in favor of Dr. Juergens on Collins's medical negligence claim, reverse the trial court's grant of summary judgment in favor of Dr. Juergens on Collins's lack of informed consent claim, and remand for further proceedings.

FACTS

*Prior Chiropractic Treatment*

In 2003, Collins sought chiropractic care from Dr. Paul Randall because of shoulder and arm pain. Over the next 10 years Collins, received treatment from Dr. Randall 194 times. Approximately 40 to 50 treatments involved manual neck adjustments. On the first visit, Dr. Randall conducted a physical examination and took x-rays of Collins's neck. But he did not conduct any detailed physical examination in subsequent visits.

Before receiving any treatment from Dr. Randall, Collins signed a form entitled, "Consent to Treatment, Release of Information and Insurance needs." Clerk's Papers (CP) at 252. The form provided the following information about the risks of chiropractic treatment

> I understand that Chiropractic treatments are usually painless and that those treatments are what will be primarily used for care. I am also aware that it is possible for an occasional treatment to hurt momentarily and/or that a temporary increase in my symptom or symptoms may occur as a result of the adjustment.

CP at 252. The form did not mention anything about the risk of vascular injury or stroke.

*Dr. Juergens's Treatment and Collins's Injury*

In 2013, Dr. Juergens took over Dr. Randall's practice. Dr. Juergens treated Collins three times in total. In June 2013, Dr. Juergens treated Collins with lumbar spine adjustments on two occasions. Dr. Juergens treated Collins again on January 28, 2014.

Dr. Juergens did not take Collins's main complaint history, perform a comprehensive physical examination with x-rays, discuss the risk of treatment or alternative procedures, or have Collins sign an informed consent form at any of Collins's visits. And Dr. Juergens did not screen Collins to determine whether Collins was at risk for vascular injury, including stroke. The only informed consent form Dr. Juergens had on file for Collins was his 2003 form.

On the January 28 visit, Collins reported recurring pain in his left shoulder and arm extending down into his index finger. Dr. Juergens had Collins lie face down on the table while he applied an activator, an instrument used to create biomechanical motion, to both sides of Collins's neck. Dr. Juergens then had Collins lie on his back and picked up his head. Dr. Juergens performed a cervical manipulation on Collins's neck, twisting it up and to the right and up and to the left. Collins heard a crunching sound during these maneuvers and felt some pain.

After being treated by Dr. Juergens, Collins sought care from his primary care physician, Dr. Gerald Faye. Dr. Faye diagnosed Collins as having a stroke incident to his recent chiropractic manipulation. An MRI revealed that Collins had a vertebral dissection between the first and second vertebrae. Dr. Maria Ramneantu, a neurologist, diagnosed Collins as having a left cerebellar stroke caused by his recent chiropractic adjustment.

Collins filed a lawsuit against Dr. Juergens and Juergens Chiropractic, PLLC in which he alleged that Dr. Juergens's manipulation of his neck during the January 28, 2014 visit caused his stroke and resulting injuries. The complaint also alleged that he had suffered damages as a result of Dr. Juergens's negligence.

*Summary Judgment Motion*

Dr. Juergens moved for summary judgment on liability regarding medical negligence and informed consent. He argued that Collins had failed to establish through expert testimony that

Dr. Juergens's alleged breach of the standard of care during his treatment of Collins proximately caused Collins's injuries or that Dr. Juergens failed to inform Collins of a material fact relating to his treatment.

In opposition, Collins submitted declarations from Alan Bragman, D.C., a chiropractic expert[1], and Dr. James McDowell, a neurologic expert. Both Dr. Bragman and Dr. McDowell provided expert testimony that the cause of Collins's stroke was Juergens's cervical manipulation. Dr. Bragman stated that Dr. Juergens's breach of the standard of care was "failing to take an adequate history, failing to undertake appropriate physical examinations and failing to establish a clinical basis for care" before performing the manipulation. CP at 138. However, Dr. Bragman declined to state that the manipulation itself was performed negligently.

Dr. Bragman testified that a complete physical examination would involve (1) checking "vitals, vascular screening, checking the cranial nerves, cervical ranges of motion, deep tendon reflexes in the upper extremities, motor testing in the upper extremities," CP at 201-02; (2) performing neurological testing because of Collins's radiating pain; (3) performing orthopedic testing for the affected part of the spine; and (4) taking spine x-rays. This examination could indicate whether a patient is at a higher risk for vertebral artery dissection and stroke.

Dr. Bragman's opinion was that without conducting this pretreatment work-up, Dr. Juergens should not have performed the cervical manipulation on Collins. Dr. Bragman stated that "you have to have the clinical evidence present before you can touch them." CP at 192. He believed that cervical manipulation was contraindicated because Dr. Juergens failed to provide a clinical basis for treatment. Further, Dr. Bragman stated that it was inappropriate for Dr.

---

[1] Dr. Juergens filed a motion to strike portions of Dr. Bragman's declaration, which he claimed introduced new opinions from Dr. Bragman that contradicted his deposition testimony. The trial court did not strike Dr. Bragman's declaration.

Juergens do anything forceful with Collins because he had no clinical information about him. He stated, "[Dr. Juergens] should not have performed the riskiest type of treatment on the patient's neck without having first met the standard of care in working up the patient to establish the basis to perform the treatment in the first place. Rather, until that work-up had been done, he should have recommended alternative forms of treatment that do not carry this same risk." CP at 138.

When asked in his deposition whether a pretreatment work-up would have made any difference, Dr. Bragman stated, "I don't know. I mean, [Dr. Juergens] may have gone through, and there may have been other symptoms on that date. He may have done a thorough exam at some point and realized there were other issues . . . . [B]ecause they didn't do anything, I can't really answer that." CP at 77. He elaborated in his declaration: "It is impossible for me to know what [a] complete clinical picture would have been for Mr. Collins on January 28, 2014 such as whether there would have been particular history (such as respiratory problem, migraine headache or many others identified in my deposition), or physical examination or x-ray findings that may have contraindicated doing the manual manipulation." CP at 138.

Regarding informed consent, Dr. Bragman's opinion was that the standard of care required that a patient be warned of the risk of stroke when a chiropractor recommends manual neck manipulation involving a vigorous, forceful rotational adjustment. He stated that the risk of vascular injury such as stroke from manual manipulation of the spine was material and significant. Dr. Bragman further stated that the risk of stroke from chiropractic treatment was not low, that it was greater when a proper work-up of the patient is not conducted, and that it was even greater for "vigorous, rotational manipulation of the neck." CP at 137. He noted that some chiropractors, including himself, included the risk of stroke on informed consent forms.

Dr. Bragman testified that a 2014 study showed that the magnitude of risk had been estimated "as high as 1 in 958 manipulations" and "as low as 1 in 5.85 million manipulations." CP at 171. However, he also stated that "the literature is unreliable in terms of setting a specific statistical risk" and the risk "is much higher than what is reported in the literature." CP at 136-37. He believed that the risk of stroke was "grossly underreported." CP at 165. In the 900 forensic cases he had handled, Dr. Bragman had seen 400 cases involving vascular injury caused by cervical manipulation. But he admitted that most of those related to an improperly performed manipulation. Dr. Bragman also noted that a chiropractic insurance company had reported that 12 percent of all chiropractic malpractice claims in 2011 involved vascular injury. When asked whether the risk of stroke due to cervical manipulation still was very low, Dr. Bragman replied, "I don't think it's low, no. I think it's a significant risk." CP at 167.

Dr. McDowell stated that "the risk of patient vascular injury, including stroke, is significant enough from manual manipulation of the cervical spine that any provider who recommends such a procedure should inform a patient of this risk and of less risky alternatives." CP at 151. He also stated that "[t]he risk of stroke occurring in the context of a chiropractic manipulation is greater with vigorous, rotational type manipulation" like the one performed on Collins. CP at 150. Dr. Faye testified that it was a known risk that vigorous neck manipulation can cause a vertebral artery dissection. However, he stated that the risk of a stroke from cervical manipulation was "very small" and was "clearly less than 1 percent" based on his review of the literature. CP at 264.

Dr. Juergens testified that he was taught techniques at chiropractic college to minimize injuries, including stroke. He stated that the most serious complication of chiropractic treatment was stroke.

Collins testified that if he had known of the risk of stroke, he would not have consented to the neck manipulation.

The trial court granted summary judgment in favor of Dr. Juergens and dismissed all of Collins's claims.[2]  Collins appeals the trial court's summary judgment order.

## ANALYSIS

### A.  SUMMARY JUDGMENT STANDARD

The standard of review of a summary judgment dismissal is de novo.  *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 569, 459 P.3d 371 (2020).  We review all evidence and reasonable inferences in the light most favorable to the nonmoving party.  *Id.*  We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Mackey*, 12 Wn. App. 2d at 569.  A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation.  *Mackey*, 12 Wn. App. 2d at 569.

The party moving for summary judgment has the initial burden to show there is no genuine issue of material fact.  *Id.*  A moving defendant can meet this burden by showing that there is an absence of evidence to support the plaintiff's claim.  *Id.*  Once the defendant has made such a showing, the burden shifts to the plaintiff – here, Collins – to present specific facts that show a genuine issue of material fact.  *Id.*  Summary judgment is appropriate if a plaintiff fails to show sufficient evidence to create a question of fact regarding an essential element on which he or she will have the burden of proof at trial.  *Id.*

---

[2] Collins moved for reconsideration, which the trial court denied.  Collins assigns error to the trial court's denial. But he does not present any argument as to how the trial court erred when it denied his motion.  Therefore, we do not address the motion for reconsideration.

B.        MEDICAL NEGLIGENCE CLAIM

Collins argues that the trial court erred in granting summary judgment in favor of Dr.

Juergens on Collins's medical negligence claim.  He claims that he presented sufficient evidence

to create a genuine issue of material fact regarding whether Dr. Juergens's breach of the standard

of care was a proximate cause of Collins's injuries.  We disagree.

1.    Legal Principles

RCW 7.70.030(1) authorizes a cause of action for injury resulting "from the failure of a

health care provider to follow the accepted standard of care."  The necessary elements of this

cause of action are:

> (1) The health care provider failed to exercise that degree of care, skill, and learning
> expected of a reasonably prudent health care provider at that time in the profession or
> class to which he or she belongs, in the state of Washington, acting in the same or similar
> circumstances;
> (2) Such failure was a proximate cause of the injury complained of.

RCW 7.70.040.

Generally, the plaintiff must establish the applicable standard of care and proximate

cause by medical expert testimony.  *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015);

*Reagan v. Newton*, 7 Wn. App. 2d 781, 790-91, 436 P.3d 411, *review denied*, 193 Wn.2d 1030

(2019).  "The expert testimony must establish what a reasonable medical provider would or

would not have done under the circumstances, that the defendant failed to act in that manner, and

that this failure caused the plaintiff's injuries."  *Newton*, 7 Wn. App. 2d at 791.  In addition, "the

expert must link his or her conclusions to a factual basis."  *Reyes v. Yakima Health Dist.*, 191

Wn.2d 79, 87, 419 P.3d 819 (2018).  If the plaintiff lacks expert testimony regarding one of the

required elements, the defendant is entitled to summary judgment on liability.  *Id. at 86.*

Proximate cause is defined as a cause " 'that in natural and continuous sequence, unbroken by an independent cause, produces the injury complained of and without which the ultimate injury would not have occurred.' " *Mehlert v. Baseball of Seattle, Inc.*, 1 Wn. App. 2d 115, 118, 404 P.3d 97 (2017) (quoting *Attwood v. Albertson's Food Ctrs., Inc.*, 92 Wn. App. 326, 330, 966 P.2d 351 (1998)). There are two elements of proximate cause: cause in fact and legal cause. *N.L. v. Bethel Sch. Dist.*, 186 Wn.2d 422, 437, 378 P.3d 162 (2016). Cause in fact refers to the physical connection between an act and an injury – whether, but for the act, the injury would not have occurred. *Id.* Legal cause refers to a "policy determination[] as to how far the consequences of a defendant's acts should extend" – whether those acts are "too remote or insubstantial to trigger liability." *Id.*

Cause in fact generally is a question for the trier of fact, unless "the causal connection is so speculative and indirect that reasonable minds could not differ." *Mehlert*, 1 Wn. App. 2d at 119. Legal causation is a question for the court to decide as a matter of law if the facts are undisputed. *N.L.*, 186 Wn.2d at 437.

2. Breach of Standard of Care

Dr. Bragman's testimony clearly established a genuine issue of fact regarding the standard of care and Dr. Juergens's breach of that standard of care. Dr. Bragman testified that a reasonable chiropractor would have conducted an adequate pretreatment work-up before administering any treatment. His opinion was that Dr. Juergens breached the standard of care by "failing to take an adequate history, failing to undertake appropriate physical examinations and failing to establish a clinical basis for care" before performing the cervical manipulation on Collins. CP at 138. Dr. Juergens does not contest this issue for purposes of summary judgment.

9

Significantly, Collins presented no evidence that Dr. Juergens's neck manipulation itself breached a standard of care. Dr. Bragman did not state that the manipulation was performed negligently. The only basis for Collins's medical negligence claim is Dr. Juergens's failure to conduct a proper pretreatment work-up and establish a clinical basis for care before manipulating Collins's neck.

3.    Proximate Cause

Collins presented sufficient evidence that Dr. Juergens's neck manipulation caused Collins's stroke. Dr. Bragman, Dr. McDowell, Dr. Faye, and Dr. Ramneantu all reached that conclusion. And Dr. Juergens does not dispute this fact for purposes of summary judgment. However, as noted above, Collins does not claim that the neck manipulation itself violated the standard of care. He argues that Dr. Juergens's failure to conduct a proper pretreatment work-up before manipulating Collins's neck breached the standard of care. Therefore, the question is whether *that breach* was a proximate cause of Collins's stroke.

Collins presented no medical testimony that a proper pretreatment work-up would have revealed that a neck manipulation was contraindicated. Dr. Bragman admitted that he did not know if Dr. Juergens's treatment would have been any different if he had conducted the proper pretreatment examination. He stated that because a work-up was not done, it was impossible for him to know whether any history, physical examination findings, or x-ray findings might have contraindicated doing the neck manipulation.

Collins essentially concedes that he cannot show that a proper work-up would have prevented Dr. Juergens from performing the neck manipulation. However, Collins argues that he can prove proximate cause a second way – by recharacterizing the breach of the standard of care. He claims that the breach can be characterized not as failing to perform the work-up, but as

performing the manipulation without the work-up. And as discussed above, there is no question on summary judgment that performing the manipulation caused Collins's stroke.

Collins's recharacterization is based on Dr. Bragman's testimony that Dr. Juergens should not have performed the neck manipulation "without having first met the standard of care in working up the patient to establish the basis to perform the treatment in the first place." CP at 138. If the breach of the standard of care was providing any treatment at all without a work-up, it would not matter what the work-up would have revealed or whether the treatment itself was negligent. But for Dr. Juergens's performing the neck manipulation without a work-up, Collins's injury would not have occurred.

We conclude that Collins cannot recharacterize the breach of the standard of care in order to create a question of fact on proximate cause. First, it is clear that the alleged breach of the standard of care here was Dr. Juergens's failure to perform an act. Dr. Bragman stated that Dr. Juergens's breach of the standard of care was "*failing* to take an adequate history, *failing* to undertake appropriate physical examinations and *failing* to establish a clinical basis for care" before performing the neck manipulation. CP at 138 (emphasis added). The proximate cause inquiry necessarily focuses on whether that failure made any difference.

Second, although Dr. Bragman also stated that proceeding with the treatment without the work-up breached the standard of care, that reframing of the issue does not change the proximate cause analysis. Under this characterization, the *decision* to proceed with the treatment was the breach, not the treatment itself. But unless the work-up would have contraindicated the treatment, the decision to proceed with the treatment also could not be the proximate cause of the stroke. The neck manipulation itself caused the stroke, but that manipulation was not negligent.

11

Third, Collins's position would lead to absurd results and would stretch proximate cause beyond its established limits in various areas of the law. Multiple examples demonstrate the absurdity of the results that would occur under Collins's approach. A surgeon's negligent failure to take the patient's blood pressure before a surgery would be the proximate cause of anything that happened during the surgery even if the result had nothing to do with blood pressure. A truck driver's negligent failure to check his tires before starting a trip would be the proximate cause of an accident occurring on the trip even if the accident had nothing to do with tires or the driver's fault. A person's negligent decision to drive while intoxicated would be the proximate cause of a tree falling on his car and injuring a passenger through no fault of the driver.

Collins argues that requiring him to prove that a proper pretreatment work-up would have revealed that a neck manipulation was contraindicated would allow Dr. Juergens to profit from his own negligence. He notes that he cannot show what a work-up would have revealed because Dr. Juergens negligently failed to perform one. Collins claims that shifting the burden to the doctor to establish that an examination would not have contraindicated treatment would be better than allowing the doctor to avoid liability.

We reject this argument. The law is clear that the plaintiff has the burden of proving proximate cause. *See LaRose v. King County*, 8 Wn. App. 2d 90, 122, 437 P.3d 701 (2019). We decline Collins's request to change the law simply because meeting that burden may be difficult in a particular case.

We conclude that Collins failed to produce sufficient evidence to show a genuine issue of fact that Dr. Juergens's breach of duty in failing to conduct a pretreatment work-up was a proximate cause of his injury. We reject Collins's attempt to recharacterize the breach of the standard of care in an attempt to create a question of fact regarding proximate cause. Therefore,

we hold that the trial court did not err in granting summary judgment in favor of Dr. Juergens on Collins's medical negligence claim.

C.      LACK OF INFORMED CONSENT CLAIM

Collins argues that the trial court erred in granting summary judgment on his lack of informed consent claim because he presented sufficient evidence that the risk of a neck manipulation causing a stroke was material and that a reasonable person in his position would have declined a neck manipulation if informed of the risk of stroke.  We agree.

1.      Legal Principles

RCW 7.70.030(3) authorizes a cause of action for injury resulting "from health care to which the patient or his or her representative did not consent."  The informed consent claim and the medical negligence claim involve distinct theories of recovery.  *Anaya Gomez v. Sauerwein*, 180 Wn.2d 610, 617, 331 P.3d 19 (2014).  The lack of informed consent cause of action allows recovery even where the treatment itself was not negligent.  *Backlund v. Univ. of Wash.*, 137 Wn.2d 651, 659, 975 P.2d 950 (1999).

The necessary elements for a claim that a health care provider failed to secure the patient's informed consent are:

> (a) That the health care provider failed to inform the patient of a material fact or facts relating to the treatment;
> (b) That the patient consented to the treatment without being aware of or fully informed of such material fact or facts;
> (c) That a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts;
> (d) That the treatment in question proximately caused injury to the patient.

RCW 7.70.050(1).

The lack of informed consent claim "is generally based on the policy judgment that patients have the right to make decisions about their own medical treatment."  *Backlund*, 137

Wn.2d at 663. Courts recognize the fundamental principle that people have the right to decide what is done to their bodies. *Smith v. Shannon*, 100 Wn.2d 26, 30-31, 666 P.2d 351 (1983).

### 2. Materiality of Risk of Stroke

The first two elements of an informed consent claim require that Collins show that there was a "material fact" – here, the risk of stroke – of which he was not informed or otherwise aware. RCW 7.70.050(1)(a)-(b).[3]

### a. Definition of "Material"

Under RCW 7.70.050(2), a fact is "material" "if a reasonably prudent person in the position of the patient . . . would attach significance to it [in] deciding whether or not to submit to the proposed treatment." A health care provider must disclose all risks that fall within this definition. RCW 7.70.050(1)(a). But the definition encompasses only serious risks, not all possible risks. *Smith*, 100 Wn.2d at 30-31. There is no duty of disclosure "unless the risk is serious – whether characterized as grave, medically significant, or reasonably foreseeable." *Ruffer v. St. Frances Cabrini Hosp. of Seattle*, 56 Wn. App. 625, 632, 784 P.2d 1288 (1990) (emphasis added). "If a risk is not foreseeable, it almost certainly is not serious and, therefore, not material." *Id.* at 633.

RCW 7.70.050(3) states:

> Material facts under the provisions of this section which must be established by expert testimony shall be either:
> (a) The nature and character of the treatment proposed and administered;
> (b) The anticipated results of the treatment proposed and administered;
> (c) The recognized possible alternative forms of treatment; or
> (d) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment administered and in the recognized possible alternative forms of treatment, including nontreatment.

---

[3] The fourth element is proximate cause. RCW 7.70.050(1)(d). There is no dispute that for summary judgment purposes, the neck manipulation caused Collins's stroke.

The Supreme Court in *Smith* explained the role of expert testimony in the materiality determination:

> The determination of materiality is a 2-step process. Initially, the scientific nature of the risk must be ascertained, *i.e.,* the nature of the harm which may result and the probability of its occurrence. The trier of fact must then decide whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment.
>
> While the second step of this determination of materiality clearly does not require expert testimony, the first step almost as clearly does. *Only a physician (or other qualified expert) is capable of judging what risks exist and their likelihood of occurrence*. The central reason for requiring physicians to disclose risks to their patients is that patients are unable to recognize the risks by themselves. Just as patients require disclosure of risks by their physicians to give an informed consent, a trier of fact requires description of risks by an expert to make an informed decision.
>
> Some expert testimony is thus necessary to prove materiality. Specifically, *expert testimony is necessary to prove the existence of a risk, its likelihood of occurrence*, and the type of harm in question.

100 Wn.2d at 33-34 (citations omitted) (emphasis added); *see also Seybold v. Neu*, 105 Wn. App. 666, 682, 19 P.3d 1068 (2001)).

      b.    Existence of the Risk and Type of Harm

Here, expert testimony from Dr. Bragman and Dr. McDowell established that manual manipulation of the cervical spine carries the risk of vascular injury and stroke. Even Dr. Juergens acknowledged that a stroke was "the most serious complication" of chiropractic treatment. CP at 234. Therefore, the question here is whether Collins presented sufficient evidence showing the likelihood of the risk occurring. *Smith*, 100 Wn.2d at 34.

      c.    Likelihood of Occurrence

Collins argues that that the testimony of Dr. Bragman and Dr. McDowell established the likelihood that a neck manipulation could cause a stroke. Dr. Juergens argues that the statements of Dr. Bragman and Dr. McDowell are conclusory and insufficient to show the likelihood of the

risk, and that the only statistical evidence showed that the risk was unforeseeable as a matter of law. We agree with Collins.

Dr. Bragman did not provide an opinion about the *specific* probability that a neck manipulation would cause a stroke. Instead, he presented general, qualitative opinions. He stated that the risk of stroke was not low, but was material and significant. And he stated that the risk was "even greater" when the chiropractor does not conduct a proper work-up (as in this case) and was "much greater" for vigorous, rotational manipulation (as in this case). CP at 137. Similarly, Dr. McDowell testified only that the risk of stroke was significant enough that it should be disclosed and that the risk was greater for vigorous, rotational manipulation.

First, Dr. Juergens argues that this testimony is insufficient because Dr. Bragman and Dr. McDowell never *quantified* the probability that a neck manipulation would cause a stroke. He cites to *Smith*, 100 Wn.2d 26 and *Ruffer*, 56 Wn. App. 625, for the suggestion that sufficient expert testimony must include statistical evidence.

We conclude that statistical evidence is not always required to establish likelihood of occurrence for purposes of an informed consent claim. Neither *Smith* nor *Ruffer*, nor any other case, imposes such a requirement. The court in *Smith* stated that expert testimony must show the "magnitude" of the risk. 100 Wn.2d at 34. But statistical evidence is not the only way to show that magnitude of a risk. In *Ruffer*, the plaintiff did not present any expert testimony and instead relied on the defendant's quantification of the risk. But the court did not state that such quantification was required. 56 Wn. App. at 632.

Second, Dr. Juergens argues that the statements of Dr. Bragman and Dr. McDowell that the risk of stroke was "material" and "significant" are mere legal conclusions that are insufficient to show the likelihood of injury. He claims that rather than providing the expert testimony

16

required under *Smith*, these opinions infringe on the role of the fact finder to determine whether the probability of particular risk is significant enough to require disclosure.

We agree. Vaguely stating that the risk is material (Dr. Bragman) or significant enough to require disclosure (Dr. McDowell) simply restates the ultimate issue for the fact finder – whether the risk is material and therefore must be disclosed. We conclude that those statements standing alone are insufficient to establish the likelihood that a neck manipulation will cause a stroke.

However, we conclude that Dr. Bragman's opinions that the risk is not low, significant, and even higher under the facts of this case (no work-up and vigorous and rotational manipulation) is sufficient to show likelihood of occurrence. Although this testimony is somewhat vague regarding probability, for purposes of summary judgment a reasonable inference is that a risk that is not low and significant reflects more than a minimal probability of occurrence. If the probability is more than minimal, a fact finder should be allowed to decide the issue of materiality. The fact finder can then determine what weight to give to these opinions.

Third, Dr. Juergens argues that the only evidence that quantifies the risk shows that the risk of stroke from a neck manipulation is unforeseeable and therefore not material as a matter of law. The highest quantified risk that Dr. Bragman was aware of was 1 in 958, or 0.104 percent.[4] Dr. Faye testified that his review of the literature showed that the risk was "clearly less than 1 percent." CP at 264. In *Ruffer*, Division One of this court ruled that a 0.002 percent to 0.005 percent (1 in 20,000 to 50,000) risk of colon perforation might occur incident to a sigmoidoscopy

---

[4] Dr. Juergens also argues that even this estimate does not establish the likelihood of risk because no one testified that this was the risk for Collins specifically. But Dr. Juergens cites no case that suggests that the law requires the plaintiff to tailor the likelihood of occurrence of the risk *to himself*. Rather, the law merely requires that plaintiff establish the likelihood of the occurrence of the risk. *Smith*, 100 Wn.2d at 34.

was so small that it was not reasonably foreseeable and did not require disclosure. 56 Wn. App. at 632-33. And in *Mason v. Ellsworth*, Division Three of this court ruled that a 0.75 percent (1 in 133.33) risk that perforation of the esophagus might occur during an esophagoscopy was so small that it was not reasonably foreseeable and did not require disclosure. 3 Wn. App. 298, 314, 474 P.2d 909 (1970).

Here, the 0.104 percent risk Dr. Bragman referenced is significantly less than the 0.75 percent the court in *Mason* deemed unforeseeable as a matter of law. The "clearly less than 1 percent" that Dr. Faye referenced, although vague, is consistent with the 0.75 percent in *Mason*. CP at 264. However, we reject Dr. Juergens's argument. Dr. Bragman expressly testified that "the literature is unreliable in terms of setting a specific statistical risk" and that "the risk of stroke is much higher than what is reported in the literature." CP at 136-37. He also stated that the risk of stroke is even higher where the chiropractor does not conduct a proper work-up and performs a vigorous rotational manipulation. Therefore, for summary judgment purposes the estimates in the literature cannot be taken as completely accurate and a reasonable inference is that the risk is much higher than 1 in 958. In addition, at least under the facts of this case, we disagree with the conclusion in *Mason* that a 1 in 133.33 risk is not material as a matter of law.[5]

Fourth, Collins presented evidence that the risk of stroke was taught at chiropractic colleges, and that other chiropractors included the risk of stroke in their informed consent forms.

---

[5] Dr. Juergens argues that Dr. Bragman's testimony improperly inflated the risk of stroke because it relied on evidence of situations in which the chiropractor did not follow the standard of care. He relies on *Holt v. Nelson*, where the court held that the law of informed consent does not require a provider to disclose the risk of provider negligence. 11 Wn. App. 230, 241, 523 P.2d 211 (1974). Dr. Bragman did reference cases in which the chiropractor was negligent. However, we conclude that this evidence is not necessary to find a question of fact on materiality.

Although this evidence is not determinative, it does create an inference that the risk of stroke is material to at least some chiropractor instructors and some practicing chiropractors.

The evidence Collins presented regarding the likelihood that a stroke would occur if Dr. Juergens manipulated his neck is not strong. But on summary judgment, we must consider all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Keck*, 184 Wn.2d at 368. Under this standard, we conclude that materiality is a question of fact that must be decided by the fact finder.

Therefore, we conclude that Collins submitted sufficient expert testimony to create a question of fact on the risk of stroke was material.

3. Whether a Reasonable Patient Would Consent

Even if the plaintiff shows that a risk is material, to prevail on an informed consent claim that plaintiff must show that "a reasonably prudent patient under similar circumstances would not have consented to the treatment if informed of such material fact or facts." RCW 7.70.050(1)(c).

a. Objective Standard

With regard to what a reasonable patient would do, courts take an objective approach. *Backlund*, 137 Wn.2d at 666. The relevant inquiry is not what a particular plaintiff would have done if informed of a risk, but what a reasonably prudent patient under similar circumstances would have done. *Id.* Evidence regarding whether a particular patient would or would not have consented to treatment if the risks had been disclosed is judged under this objective standard. *Id.*

In determining whether a reasonably prudent patient would have declined treatment, we must consider the situation of the particular plaintiff. *Id.* at 667. This includes the plaintiff's medical condition, age, risk factors, and treatment alternatives. *Id.* However, as noted above,

the inquiry is what a reasonably prudent person in the plaintiff's situation would have done, not what the plaintiff himself or herself would have done. *Id.* at 666-67. This question generally is a question of fact for the fact finder. *See id*. at 667.

        b.    Analysis

Here, Collins presented to Dr. Juergens with recurring pain in his left shoulder and arm. There is no indication that the pain was debilitating. And alternative forms of treatment were available that Dr. Bragman stated involved virtually no risk, including use of the activator that Dr. Juergens used before manipulating Collins's neck. On the other hand, a neck manipulation did involve a risk of stroke.

Collins had two risk factors for someone undergoing manipulation: a history of smoking and some loss of sensation in his arm. In addition, Collins was 61 years old, and presumably had a greater risk of stroke than a younger patient.

Collins testified that he would not have consented to a neck manipulation if he had known the risk of stroke. This testimony is not determinative of what a reasonable patient would do. *Backlund*, 137 Wn.2d at 666. But the testimony is at least minimally relevant and admissible on this issue and the fact finder can determine whether the assertion is reasonable.[6] *See id.*

To be sure, there also is evidence that a reasonable person would have consented to a neck manipulation even if he or she had been informed of the risk. For example, Collins had received chiropractic treatment from Dr. Randall for 10 years without incident. However, we

---

[6] Dr. Bragman also testified that in his opinion, a reasonable patient would want to be informed of the risk of stroke, particularly because no work up was done. The parties do not address whether expert testimony on this factual issue would be admissible. We do not address this issue.

must view the evidence in the light most favorable to Collins. *Keck*, 184 Wn.2d at 368. There is sufficient evidence that as between a vigorous neck manipulation, which carried a material risk of stroke, and several no-risk alternatives, a reasonably prudent patient in Collins's shoes might opt for the latter.

Therefore, we conclude that there is a genuine issue of fact as to whether a reasonably prudent patient under similar circumstances would have consented to a neck manipulation.

CONCLUSION

We affirm the trial court's grant of summary judgment in favor of Dr. Juergens on Collins's medical negligence claim, but reverse the trial court's grant of summary judgment in favor of Dr. Juergens on Collins's lack of informed consent claim and remand for further proceedings.

MAXA, J.

We concur:

SUTTON, A.C.J.

GLASGOW, J.