# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MATTHEW MENZER, as Litigation Guardian Ad Litem of KJM, a minor, | No. 53972-1-II |
| Appellant, | |
| v. | |
| CATHOLIC HEALTH INITIATIVES, a foreign corporation; FRANCISCAN HEALTH SYSTEM, a Washington corporation; and SAINT JOSEPH MEDICAL CENTER, | UNPUBLISHED OPINION |
| Respondents. | |

SUTTON, J. — Matthew Menzer, as litigation guardian ad litem for KJM, a minor, sued Catholic Health Initiatives (CHI), Franciscan Health System (FHS), and Saint Joseph Medical Center (St. Joseph). CHI is the parent corporation of FHS and FHS owns St. Joseph. KJM alleged that CHI failed to adopt specific procedures requiring FHS and St. Joseph to screen newborns for a rare genetic disorder that KJM was later diagnosed with after his birth at St. Joseph. At the time of his birth, the Department of Health did not mandate this newborn screening test in acute care hospitals in Washington State although other states did.

KJM claims that CHI, a corporate entity, owed him a duty because it directed health care decisions regarding his care and it directed health care decisions to its subsidiaries in other states' hospitals throughout the United States. KJM argues that CHI meets the definition of a Washington "health care provider" because it employed one licensed doctor in Washington. KJM argues that

CHI can be sued for damages for injuries to KJM occurring as a result of health care under chapter 7.70 RCW. Alternatively, if CHI is not a health care provider, KJM argues that we should expand RCW 7.70.020's definition of health care provider to include "persons engaged in the healing arts," which would then include CHI. KJM also argues that CHI, as a principal, is vicariously liable for FHS's and St. Joseph's actions based on their apparent authority to act for CHI. Thus, KJM argues that the superior court erred by granting summary judgment dismissal to CHI.

We hold that because CHI is not a health care provider under RCW 7.70.020, CHI does not owe a duty to KJM and even assuming a duty is owed, KJM fails to prove causation as a matter of law, and no duty exists under common law. We decline to expand the definition of health care provider and we hold that CHI is not vicariously liable for FHS or St. Joseph. We also decline KJM's invitation to apply Washington's definition of health care provider in a way that assumes CHI directed health care decisions in this matter as KJM provided no evidence that was the case. We affirm.

FACTS

I. BACKGROUND

A. CHI, FHS, AND ST. JOSEPH

CHI is a nonprofit parent corporation formed in 1996 and incorporated in Colorado. CHI's purpose is to "promote and support, directly or indirectly, by donation, loan, or otherwise, the interests and purposes" of its "sponsored organizations." Clerk's Papers (CP) at 109-10. By 2005, CHI was the parent corporation of several subsidiary corporations that independently owned and operated hospitals in other states.

2

CHI describes itself as a "national health care institution." CP at 50. CHI's mission, "[a]s one of the nation's largest nonprofit health care systems," is to "go beyond the provision of quality health care to help protect the vulnerable; to encourage participation in the political process; and to safeguard the environment." CP at 278. CHI has 64 hospital facilities and 50 long-term care and residential-care facilities in 19 states.

FHS was formed in 1981. CHI was created when FHS and two other Catholic health care systems merged, but they continued to exist as separate subsidiary corporations. FHS owns and operates St. Joseph. The FHS Board of Directors was the governing body for St. Joseph. FHS was responsible for appointing medical staff, approving clinical privileges for medical staff, ensuring St. Joseph and its staff carried out peer review activities and other quality assurance activities in accordance with RCW 70.41.200, approving contracts with physicians to perform specific activities, and providing general oversight and supervision of the hospital.

In August 2005, when KJM was born, no person employed by CHI had been granted privileges as a member of St. Joseph's medical staff. In August 2005, the corporate operations of CHI and FHS were separate and distinct. Both St. Joseph and FHS were subject to oversight by the CHI Board of Directors, including subject to the approval of or removal by CHI.

CHI "did not have any involvement in the clinical decision-making or treatment of patients at St. Joseph." CP at 102. When KJM was born at St. Joseph in August 2005, CHI employed 46 people who "[had] an office, workspace, or were otherwise associated with working in Washington State." CP at 103.

Of the CHI employees who were associated with working in Washington State, Dr. Gregory Semerdjian was the only one who was "a licensed health care provider." CP at 103. Dr.

3

Semerdjian was CHI's Vice President of Medical Operations, a member of the Clinical Services Group, and a member of CHI's Physician Leadership Council. He attended the 2004 Genetics Advisory Summit and the 2005 meeting of the Genetics Advisory Committee. Dr. Semerdjian did not provide health care services to KJM. Dr. Semerdjian has not practiced clinical medicine since 1991. Dr. Semerdjian was employed as a remote Vice President of Medical Operations to work with rural hospitals in North Dakota, Minnesota, Kansas, and Kentucky, not in Washington State. He did reside in Tacoma, Washington, but his work required him to travel out of state to the facilities CHI assigned him. He had a cubicle in an office space owned by FHS, but he did not work with any FHS facilities, or work at St. Joseph, and had no role related to making health care decisions about KJM.

B. SUPPLEMENTAL NEWBORN SCREENING AND KJM'S BIRTH

In August 2005, KJM was born at St. Joseph in Tacoma. At that time, St. Joseph did not include a newborn screening test for Glutaric Acidemia type 1 (GA-1) in its supplemental newborn screening (SNS) panel. The pediatrician who attended to KJM at St. Joseph was not named in the lawsuit, but could have ordered individual genetic testing if necessary. No other acute care hospitals licensed in Washington State offered the test at that time. The Department of Health required acute care hospitals in the state to conduct newborn screening for nine genetic disorders in August 2005, but did not mandate newborn screening for metabolic disorders such as GA-1.

KJM was diagnosed with GA-1 when he was 11 months old. By the time he was diagnosed, KJM had developed brain damage due to GA-1. KJM's mother said she would have gotten the additional screening test at St. Joseph if it had been offered.

Prior to KJM's birth, other states[1] had mandated testing for GA-1 in the SNS panel. In 2005, hospitals in Colorado and Pennsylvania voluntarily included the GA-1 test in their SNS panel despite it not being mandatory in those states.

KJM's mother noticed the CHI logo on the admission paperwork she filled out upon arriving at St. Joseph to give birth, which was "important" to her.

C. CHI'S KNOWLEDGE OF SNS

Dr. John Anderson, CHI's Chief Medical Officer from 2004 to 2008, explained that CHI's Clinical Services Group did not have a pediatrician because CHI did not include a children's hospital; the hospitals in its subsidiaries provided adult care. CHI provided best practice resources in the form of "practice bundles" to its subsidiaries. "Practice bundles" include all of the resources that would be necessary to implement a practice change, but they do not mandate a particular course of testing or treatment.[2] Dr. Anderson explained that SNS was not a priority at that time. CHI did not provide a practice bundle to its subsidiaries relating to SNS. Baylor University's Institute for Metabolic Disease, the institution Anderson previously worked at, ensured that all of its hospitals offered SNS before any state mandate.

---

[1] These states include: Iowa, Minnesota, Oregon, Idaho, Maryland, Nebraska, North Dakota, Ohio, Missouri, and South Dakota.

[2] Wash. Court of Appeals, Div. II oral argument, *Matthew Menzer as Litigation Guardian ad Litem of KJM v. Catholic Health Initiatives*, No. 53972-1-II (May 20, 2021), at 12 min., 41 sec. through 14 min., 44 sec. (on file with court). KJM has not pointed to any evidence in this record that contradicts this explanation of practice bundles, nor has KJM provided evidence in this record to contradict the assertion that a practice bundle does not mandate particular testing or treatment.

II. PROCEDURE

In March 2017, KJM filed a negligence suit against FHS d/b/a/ St. Joseph for alleged negligence in August 2005, and it alleged that FHS owned and operated St. Joseph. Later, KJM amended his complaint to allege that CHI owed an independent duty to KJM for its failure to conduct SNS tests that he alleged would have detected GA-1 and for its failure to inform KJM's parents of the material facts relating to KJM's care and treatment. CHI denied that it employed or credentialed medical providers at St. Joseph and denied it owed a duty to KJM.

CHI moved for summary judgment dismissal of KJM's claims against it because it did not employ or credential any licensed health care provider at St. Joseph—who allegedly caused damages to KJM. CHI argued that (1) CHI was not a health care provider as defined in RCW 7.70.020, nor was any employee of CHI involved in KJM's care and treatment, (2) no common law duty exists, and (3) CHI was not vicariously liable for FHS or St. Joseph under the corporate medical negligence doctrine.

KJM argued in response that CHI is a health care provider under Washington law that owes a duty to the participants in its system because CHI was "registered to do business in Washington as a corporation whose purpose was to 'provide, conduct, and administer health care and related services,' in Washington." CP at 251 (boldface type omitted). KJM also argued that CHI had a common-law duty to patients of its health care system and CHI had voluntarily assumed a duty owed to KJM. In opposition to CHI's motion for summary judgment KJM filed the declaration of its expert, Dr. Leslie Selbovitz. She was the Chief Medical Officer and Senior Vice President for Medical Affairs at Milford Regional Medical Center in Milford, Massachusetts. She stated that

6

"KJM was not diagnosed until after he was approximately 11[ ]months old which was too late, as by then he had suffered brain damage." CP at 675.

The superior court ruled that CHI did not owe KJM a duty under RCW 7.70.030 because CHI was not a health care provider as defined in RCW 7.70.020. KJM filed a motion for reconsideration which the superior court denied. In its order denying KJM's motion for reconsideration, the superior court reiterated its ruling on summary judgment regarding CHI:

> It is not enough to allege CHI was negligent. It is fundamental that an action for negligence does not lie unless the defendant owes a duty . . . to [the] plaintiff. *McCluskey v. Handorff-Sherman*, 125 Wn.2d 1, 6, 882 P.2d 157 [] (1994). [KJM] has failed to articulate why CHI had a duty to [KJM] here.

CP at 1490.

KJM appeals the superior court's orders granting summary judgment and denying reconsideration, the final judgment of dismissal of CHI with prejudice, the order dismissing the remaining defendants,[3] and the order striking the trial date.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

"The standard of review of a summary judgment dismissal is de novo." *Collins v. Juergens Chiropractic, PLLC*, 13 Wn. App. 2d 782, 792, 467 P.3d 126 (2020). "We review all evidence and reasonable inferences in the light most favorable to the nonmoving party." *Collins*, 13 Wn. App. 2d at 792. "We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." CR 56(c);

---

[3] KJM voluntarily dismissed his claims without prejudice against FHS and St. Joseph pursuant to CR 41(a)(1)(A).

*Collins*, 13 Wn. App. 2d at 792. "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation." *Collins*, 13 Wn. App. 2d at 792.

"The party moving for summary judgment has the initial burden to show there is no genuine issue of material fact." *Collins*, 13 Wn. App. 2d at 792. "A moving defendant can meet this burden by showing that there is an absence of evidence to support the plaintiff's claim." *Collins*, 13 Wn. App. 2d at 792. "Once the defendant has made such a showing, the burden shifts to the plaintiff . . . to present specific facts that show a genuine issue of material fact." *Collins*, 13 Wn. App. 2d at 792. "Summary judgment is appropriate if a plaintiff fails to show sufficient evidence to create a question of fact regarding an essential element on which he or she will have the burden of proof at trial." *Collins*, 13 Wn. App. 2d at 792.

## II.  NO DUTY OWED TO KJM

KJM argues that CHI qualifies as a health care provider under RCW 7.70.020 because it employs Dr. Semerdjian, a physician licensed in Washington. KJM argues that CHI, as a health care provider, owed him a duty to act reasonably because it is a corporate health system with superior knowledge, resources, and control over the local hospital, St. Joseph, where KJM received care. We disagree. We hold that CHI is not a health care provider as defined in RCW 7.70.020. We further hold that CHI had no employment relationships with any licensed health care providers who did make health care decisions regarding KJM at St. Joseph, particularly related to what screening tests for newborns were required to be given in August 2005, and thus, CHI did not owe KJM a duty.

A. LEGAL PRINCIPLES

    1. Statutory Interpretation

We review questions of statutory interpretation de novo. *Jametsky v. Olsen*, 179 Wn.2d 756, 761, 317 P.3d 1003 (2014). Our goal when interpreting a statute is to "ascertain and carry out the legislature's intent." *Jametsky*, 179 Wn.2d at 762. We give effect to the plain meaning of the statute as "derived from the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky*, 179 Wn.2d at 762 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)). If a statute's meaning is plain on its face, we give effect to that meaning as an expression of legislative intent. *Blomstrom v. Tripp*, 189 Wn.2d 379, 390, 402 P.3d 831 (2017).

    2. Duty under Chapter 7.70 RCW

To prevail in a negligence claim, a plaintiff must establish "duty, breach, and resultant injury; and the breach of duty must also be shown to be the proximate cause of the injury." *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). To prove proximate cause, a plaintiff must prove cause in fact and legal causation. *Hartley*, 103 Wn.2d at 777.

Our supreme court has held, "'[W]henever an injury occurs as a result of health care, the action for damages for that injury is governed exclusively by RCW 7.70.'" *Fast v. Kennewick Pub. Hosp. Dist.*, 187 Wn.2d 27, 34, 384 P.3d 232 (2016) (alteration in original) (quoting *Branom v. State*, 94 Wn. App. 964, 969, 974 P.2d 335 (1999)).

Under RCW 7.70.030(1), a plaintiff can only recover damages from a health care related injury if he or she can prove that the "injury resulted from the failure of a health care provider to follow the accepted standard of care." Actions under chapter 7.70 RCW are all predicated on an

act or omission of a health care provider. Thus, under *Fast*, chapter RCW 7.70 is KJM's exclusive remedy for alleged damages regarding his birth at St. Joseph and the alleged failure to provide genetic testing in August 2005. 187 Wn.2d at 34. There is no remedy at common law for KJM's injuries.

To determine when chapter 7.70 applies, Washington courts look to the definition of "health care provider" under RCW 7.70.020 which is defined as either:

> (1) A *person* licensed by this state to provide health care or related services including, but not limited to, an acupuncturist or acupuncture and Eastern medicine practitioner, a physician, osteopathic physician, dentist, nurse, optometrist, podiatric physician and surgeon, chiropractor, physical therapist, psychologist, pharmacist, optician, physician assistant, midwife, osteopathic physician's assistant, nurse practitioner, or physician's trained mobile intensive care paramedic, including, in the event such person is deceased, his or her estate or personal representative;

> (2) An *employee or agent* of a person described in part (1) above, acting in the course and scope of his [or her] employment, including, in the event such employee or agent is deceased, his or her estate or personal representative; or

> (3) An *entity*, whether or not incorporated, facility, or institution employing one or more persons described in part (1) above, including, but not limited to, a hospital, clinic, health maintenance organization, or nursing home; or an officer, director, employee, or agent thereof acting in the course and scope of his or her employment, including in the event such officer, director, employee, or agent is deceased, his or her estate or personal representative.

(Emphasis added.)

"Health care" is defined as:

> "[T]he process in which [the physician] was utilizing the skills which he had been taught in examining, diagnosing, treating or caring for the plaintiff as his patient."

*Reagan v Newton*, 7 Wn. App. 2d 781, 791, 436 P.3d 411 (2019), *review denied*, 193 Wn.2d 1030 (2019) (alterations in original) (internal quotation marks omitted) (quoting *Beggs v. Dep't of Soc. & Health Servs.*, 171 Wn.2d 69, 79, 247 P.3d 421 (2011)).

The question of who is a health care provider under RCW 7.70.020 determines whether a person or entity owes a duty to a patient under chapter 7.70 RCW. The statutory definition of "health care provider" includes persons "licensed by this state to provide health care or related services" and their employers. RCW 7.70.020(1), (3).

B. CHI DOES NOT MEET THE DEFINITION OF "HEALTH CARE PROVIDER" UNDER RCW 7.70.020

KJM argues that CHI should be considered a "health care provider" under RCW 7.70.020(3) because it employs one physician licensed in Washington, Dr. Semerdjian. KJM also argues that there was a "nexus" between Dr. Semerdjian's activities and KJM's alleged injuries and Dr. Semerdjian "was directly involved in the CHI conduct that caused injury to KJM." Br. of Appellant at 36-37. The record in this case does not support this assertion. We hold that under the plain language of RCW 7.70.020, CHI does not meet the definition of a health care provider as correctly determined by the superior court.

Under a plain language analysis, "health care provider" is defined as persons "licensed by this state to provide health care or related services," and their employers. RCW 7.70.020(1), (3). Employing a person who is licensed in Washington State, does not bring that entity, here CHI, under the definition of health care provider where the employee is not actively engaged in providing health care or related services in Washington State. To the extent that the plain language of the definition reaches Dr. Semerdjian under the plain language of the statute, CHI's corresponding duty is limited to its role as an employer. He was not providing health care to any

patients in Washington, he had not provided direct care to patients in Washington since 1991, and CHI employed no person who was providing healthcare to patients in Washington when KJM was injured in 2005. Thus, for purposes of this case, CHI was not acting as a health care provider under the statute.

There is no evidence in the record that Dr. Semerdjian has provided health care in Washington as a physician since 1991. Dr. Semerdjian was not employed or credentialed at St. Joseph or at any FHS facilities in August 2005. Further, CHI does not employ any physicians who are actively engaged in the provision of health care services in Washington. Under the plain language of RCW 7.70.020, CHI is not a health care provider because CHI does not employ anyone actively engaged in providing health care or related services in Washington State.

C. EXPANDED DEFINITION OF "HEALTH CARE PROVIDER" UNDER RCW 7.70.020

KJM alternatively asserts that we should expand the definition of health care provider to "construe chapter 7.70 RCW to govern all persons engaged in the healing arts," arguing that to do so would serve public policy. Br. of Appellant at 29. KJM fails to cite authority to support this argument and we decline to expand the definition of health care provider in RCW 7.70.020 contrary to the plain language of the statute and legislative intent.

1. Legal Principles

Preliminarily, RAP 10.3(a)(6) requires a party to cite supporting authority for its argument. We note that KJM fails to cite authority for its proposed expansion of the definition of health care provider. But we exercise our discretion under RAP 1.2(a) to address this issue.

Our goal in interpreting a statute is to "ascertain and carry out the legislature's intent." *Jametsky*, 179 Wn.2d at 762. We give effect to the plain meaning of the statute as "derived from

the context of the entire act as well as any 'related statutes which disclose legislative intent about the provision in question.'" *Jametsky*, 179 Wn.2d at 762 (quoting *Campbell*, 146 Wn.2d at 11). If a statute's meaning is plain on its face, we give effect to that meaning as an expression of legislative intent. *Blomstrom*, 189 Wn.2d at 390. We avoid construing a statute to lead to absurd results. *Jespersen v. Clark County*, 199 Wn. App. 568, 578, 399 P.3d 1209 (2017). We do not add words to a statute that are not there. *Jespersen*, 199 Wn. App. at 578.

KJM asks us to expand the definition of a "health care provider" to include everyone "engaged in the healing arts" as does the language in RCW 4.24.290. We decline to do so. If the legislature had intended to include "all persons engaged in the healing arts" along with "person[s] licensed by this state to provide health care or related services," then presumably it would have done so. RCW 7.70.020(1).[4] However, it did not. KJM's proposed definition is not consistent with the plain language of the statute or legislative intent. We decline KJM's invitation to expand the definition.

2. Public Policy Does Not Support KJM's Claim

KJM next claims that "[i]f CHI is not subject to any negligence claim, there would be no way for the law of torts to encourage CHI to act reasonably or to hold it responsible when it unreasonably injures babies like KJM." Br. of Appellant at 41-42. But this argument wrongly assumes that CHI owed KJM a duty and subsequently breached that duty. We held earlier that CHI did not owe KJM a duty.

---

[4] The Legislature most recently amended this statute in 2019 and did not expand the definition at that time.

KJM also claims that without this expanded definition of health care provider to include CHI, he is left without any tort remedy here. But that is not accurate. Nothing in our analysis prevents a cause of action against individual health care providers, St. Joseph, or FHS.

Further, we agree with CHI that the corporate practice of medicine doctrine disfavors creating a duty for CHI in this case. Our supreme court has held that "[t]he corporate practice of medicine doctrine provides that, absent legislative authorization, a business entity may not employ medical professionals to practice their licensed profession." *Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs.*, *PLLC*, 168 Wn.2d 421, 430, 228 P.3d 1260 (2010). KJM's argument, that CHI exercised "complete corporate control over the policies and procedures of its Washington hospitals," is at odds with the corporate structure of CHI, which left the health care decisions regarding KJM's care and genetic testing to the licensed health care providers who provided KJM care and treatment at St. Joseph. Br. of Appellant at 37.

CHI did not mandate what newborn genetic screening tests KJM's doctors or St. Joseph had to do in August 2005, and there is no evidence in the record that it did so. Providing specific practice bundles on patient care at the request of its subsidiaries did not result in CHI substituting its judgment for the clinical judgment of the licensed and credentialed health care providers working at the hospitals in its subsidiaries. The legislature has determined that licensed health care providers should make health care decisions with their patients and the provider owes a duty to the patient under chapter 7.70 RCW. Thus, for these reasons, public policy does not support imposing a duty on CHI in this case.

14

D.  NO FACTUAL OR LEGAL CAUSATION

Even assuming there is a duty owed by CHI to KJM, KJM fails to establish cause in fact or legal causation as a matter of law.  KJM sued for damages for injuries resulting from CHI's alleged failure to include SNS testing for specific metabolic and genetic disorders, including GA-1, in the newborn tests offered to pediatric patients like KJM at St. Joseph.  KJM also alleged that the defendants failed to consider other "best medical practices."  CP at 42.

Cause in fact, or "but for" causation, refers to the "physical connection between an act and an injury."  *Hartley*, 103 Wn.2d at 778.  KJM argues that a jury could find a nexus between Dr. Semerdjian's activities and KJM's injury because of the role that Dr. Semerdjian had within the CHI system.  But KJM fails to establish any cause in fact linking Dr. Semerdjian's activities to the health care decisions made by the licensed health care providers at St. Joseph which allegedly caused KJM's damages.  Further, as a matter of law, KJM also fails to establish legal causation.  Dr. Semerdjian did not treat KJM in August 2005 at St. Joseph, nor was he involved in making any health care decisions related to KJM, including newborn genetic screening for KJM at St. Joseph.  The record also shows that CHI did not make any health care decisions or direct the health care of the licensed health care providers who did treat KJM at St. Joseph and who made decisions related to the genetic screening of KJM at St. Joseph.

KJM argues that CHI should have gone beyond the mandated screening on an institutional basis instead of a hospital-by-hospital basis because Baylor's Institute for Metabolic Disease, the institution CHI's Chief Medical Officer previously worked at, had ensured that all of its hospitals offered SNS before any state mandate.  KJM does not cite anything that demonstrates that CHI had an obligation to adopt a similar SNS testing policy to that of Baylor's; rather, he simply asserts

15

that CHI *should* have adopted a similar policy. This argument is cursory at best and does not establish a causal connection between the treatment KJM received and his injury, especially where there is no evidence that CHI could have mandated a particular course of testing or treatment under the established relationship between CHI and KJM's health care providers. RAP 10.3(a)(6).

Because KJM fails to establish causation, and we can affirm on any grounds supported by the record, this additional basis supports summary judgment dismissal of KJM's claims against CHI. *See Port of Anacortes v. Frontier Indus., Inc*., 9 Wn. App. 2d 885, 892, 447 P.3d 215 (2019), *review denied*, 195 Wn.2d 1005 (2020).

E.  CONCLUSION

KJM's argument that CHI owes him a duty under chapter 7.70 RCW is contrary to the plain language of the statute and legislative intent. We hold that the superior court correctly ruled that CHI did not owe a duty to KJM under chapter 7.70 RCW, and thus, it properly granted summary judgment dismissal on this basis.

### III.  VICARIOUS LIABILITY – APPARENT AUTHORITY

Finally, although not determinative of this appeal, KJM argues that CHI was vicariously liable for FHS and St. Joseph because they acted with apparent authority for CHI. Citing his mother's declaration, KJM states that CHI's name was printed on almost all of the medical records at St. Joseph's related to KJM's birth and newborn care. There is no evidence of apparent authority of FHS or St. Joseph sufficient to create a genuine issue of material fact even viewing the evidence in the light most favorable to KJM. Thus, we hold that CHI is not vicariously liable for FHS or St. Joseph.

"Under apparent authority, an agent . . . binds a principal . . . if objective manifestations of the principal 'cause the one claiming apparent authority to actually, or subjectively, believe that the agent has authority to act for the principal' and such belief is objectively reasonable.'" *Mohr v. Grantham*, 172 Wn.2d 844, 860-61, 262 P.3d 490 (2011) (quoting *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994)). To recover under a theory of apparent agency, a plaintiff must show (1) conduct by the principal that would cause a reasonable person to believe that the agent was in fact an agent of the principal, and (2) reliance on that apparent agency relationship by the plaintiff. *Wilson v. Grant*, 162 Wn. App. 731, 744, 258 P.3d 689 (2011).

Here, KJM's mother stated in her declaration that the CHI logo was on the admission paperwork she filled out at St. Joseph when she arrived at the hospital to give birth to KJM. She stated this logo appeared on other "medical records and other documents relating to KJM's pediatric care after discharge." CP at 990. Based on this evidence in the record, KJM's mother had already selected St. Joseph as the hospital she intended to give birth at and only noted the CHI logo on the paperwork upon arrival and following discharge. KJM's mother did not select St. Joseph because she thought that specific hospital was acting at CHI's agent. KJM has not set forth any additional evidence that shows that FHS or St. Joseph had authority to act for CHI regarding the health care decisions of the licensed health care providers at St. Joseph who provided care and treatment to KJM, or that KJM's mother thought FHS or St. Joseph were apparent agents of CHI.

Thus, we hold that CHI is not vicariously liable for FHS or St. Joseph under a theory of apparent authority, and KJM fails to present sufficient evidence to support this claim.

No. 53972-1-II

CONCLUSION

We hold that because CHI is not a health care provider under RCW 7.70.020, CHI does not owe a duty to KJM and even assuming a duty is owed, KJM fails to prove causation as a matter of law, and no duty exists under common law. We decline to expand the definition of health care provider and we hold that CHI is not vicariously liable for FHS or St. Joseph. We also decline KJM's invitation to apply Washington's definition of health care provider in a way that assumes CHI directed health care decisions in this matter as KJM provided no evidence that was the case. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

GLASGOW, A.C.J.

VELJACIC, J.

18